UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

_____

UNITED STATES OF AMERICA,

                     Plaintiff,

         v.

JAMES HENRY McAULEY, JR.,

                  Defendant.

_____

                                    <u>REPORT & RECOMMENDATION</u>

                                    11-CR-6083CJS

## <u>PRELIMINARY STATEMENT</u>

      By Order of Hon. Charles J. Siragusa, United States District Judge, dated May 2,

2011, all pretrial matters in the above captioned case have been referred to this Court pursuant to

28 U.S.C. §§ 636(b)(1)(A)-(B).  (Docket # 2).

      Defendant James Henry McAuley, Jr. ("McAuley") has been charged in two

counts of a seven-count superseding indictment returned against him and co-defendants

Richard W. Mar ("Mar"), Donna Boon ("Boon"), Richard E. Riedman ("Riedman"), Gordon L.

Montgomery ("Montgomery"), Jeffrey A. Tyler ("Tyler"), Paul S. Griffin ("Griffin")[1], Robert W.

Moran, Jr. ("Moran"), Gina Tata ("Tata") and Timothy M. Stone ("Stone").  (Docket # 126).

The first count of the superseding indictment charges McAuley, Mar, Boon, Riedman,

Montgomery, Tyler and Griffin with conspiring between the years 2002 and 2010 to possess with

intent to distribute and to distribute methamphetamine, in violation of 21 U.S.C. § 846.[2]  (*Id.* at

_____

     [1]  Griffin pled guilty to the charge against him and was sentenced on March 25, 2013.  (Docket # 392).

     [2]  A full recitation of the charges in the superseding indictment may be found in this Court's Report and
Recommendation dated November 26, 2013.  (Docket # 441).

2).  The third count of the superseding indictment charges McAuley, Moran and Tata with assault

with a dangerous weapon in aid of racketeering activity, in violation of the violent crimes in aid

of racketeering statute ("VICAR"), 18 U.S.C. §§ 1959(a)(3) and 2.  (*Id.* at 6, ¶ 8).

Currently pending before the Court are McAuley's motions to dismiss the

superseding indictment on the grounds of insufficiency and double jeopardy, and to suppress

statements, jailhouse recordings and tangible evidence.[3]  (Docket # 234).  For the reasons

discussed below, I recommend that the district court deny McAuley's motions.


### FACTUAL BACKGROUND

I. **November 19, 2003 Arrest of McAuley**

This Court conducted an evidentiary hearing on October 12, 2012 concerning the

circumstances surrounding McAuley's arrest on November 19, 2003 and statements he made

during his encounter with law enforcement on that day.  (Docket # 303).[4]  During the hearing, the

government offered testimony from Lieutenant Douglas Troy Marx ("Marx"), an employee of the

Utah Department of Public Safety.  (Tr. A 5-6).

A. **Testimony of Marx**

Marx testified that he had been employed by the Utah Department of Public

Safety for approximately eighteen years.  (Tr. A 7).  According to Marx, he was certified as a

"drug recognition expert" in 1997 and a drug recognition instructor in 1999.  (Tr. A 60-61).

---

[3]  McAuley's omnibus motion also sought, *inter alia*, a bill of particulars, *Brady* material, disclosure of witness lists, evidentiary rulings under Fed. R. Evid. 404(b), 608 and 609, severance, joinder in the pretrial motions of co-defendants, and preservation of rough notes.  (Docket # 234).  Each of these requests was either resolved by the parties or decided in open court by the undersigned on August 14, 2012.  (Docket ## 266, 267).

[4]  The transcript of the October 12, 2012 hearing shall be referred to as "Tr. A __."  (Docket # 314).

On November 19, 2003, at approximately 8:56 a.m., Marx received a dispatch regarding a vehicle on fire on Interstate 80 in Tooele County, Utah.  (Tr. A 6, 9).  Marx testified that he responded to the area at approximately 9:19 a.m.  (Tr. A 9-10).  When he arrived, he observed a blue and silver Chevrolet Suburban on the side of the road with its hood open and a semi-truck parked in front of the Suburban.  (Tr. A 10).  According to Marx, by the time he arrived, Jeff Mott ("Mott"), a deputy for the Tooele County Sheriff's Department, was already on scene and interacting with an individual in the vicinity of the disabled Suburban.  (*Id.*).

According to Marx, smoke was emanating from the Suburban, and Mott and the individual appeared to be trying to extinguish the fire.  (*Id.*).  As Marx approached the scene, two individuals from the vicinity of the semi-truck came up and identified themselves.  (Tr. A 11, 37).  According to Marx, the individuals (the Brutons[5]) told him that they had stopped to help extinguish the fire and that they had observed the driver of the Suburban hide "something in his pocket that they described as possibly drugs, in his inside jacket pocket."  (Tr. A 11).  Marx did not ask any questions about their observations, and he allowed them to leave the scene at that time.  (Tr. A 37-38).

At that point, Marx approached Mott and the individual near the Suburban, who identified himself as James McAuley.  (Tr. A 11).  According to Marx, McAuley appeared fidgety and nervous, had dilated pupils, was slurring his speech and had a hunting knife in a sheath hanging from his belt.  (Tr. A 12, 14, 19, 39).  Marx testified that dilated pupils, particularly during daylight hours, may be a characteristic of drug use.  (Tr. A 19, 65, 69-70).

---

[5]  During the hearing, Marx was unable to recall the identities of the individuals, but they were subsequently referred to as the "Broutons" (Tr. A 10, 37), and Marx's incident report identifies them as Allan and Marion Bruton (Docket # 234-1 at Ex. E).  For ease of reference, they will be referred to as the "Brutons."

Marx asked McAuley what happened, and McAuley responded that his carburetor had caught fire. (Tr. A 12-13). According to Marx, McAuley stated that he had just purchased the vehicle and was driving it home to New York. (Tr. A 14).

Marx testified that he then informed McAuley that the Brutons reported observing him hide something in his pocket that appeared to be drugs. (Tr. A 14, 41). McAuley denied the accusation. (Tr. A 14). Marx then asked McAuley if he could search him for drugs or weapons. (Tr. A 14-15). According to Marx, McAuley responded, "What would happen if I don't agree to that or if I refuse to let you?" (Tr. A 15). Marx responded, "I'm going to check you for weapons." (Tr. A 15, 42). At that point, according to Marx, McAuley turned around and spread his arms to the side. (Tr. A 15-16, 43).

Marx conducted a search, which he referred to as a "patdown," of McAuley for "weapons and/or drugs." (Tr. A 16). Marx testified that he likely would have conducted the search in the same manner whether or not he was searching for drugs and weapons, or weapons only. (Tr. A 71-72). Marx indicated that McAuley had "quite a few papers and receipts in his pockets." (Tr. A 17). During the search, Marx felt an envelope in one of McAuley's jacket pockets.[6] (Tr. A 16-17, 45). According to Marx, he removed the envelope and looked in it.[7] (Tr. A 16). Marx could not recall whether he felt anything other than papers as he patted the pocket before removing the envelope. (Tr. A 82-83). Marx testified that the envelope contained

---

[6] Initially, Marx could not identify which jacket pocket had contained the envelope. (Tr. A 17, 45). During subsequent testimony, however, Marx recalled that he had discovered the envelope in the same pocket that the Brutons had reported observing McAuley place the suspected drugs. (Tr. A 83).

[7] Marx's report from the incident indicated that he collected a "plastic bag with white, powdery substance," but did not indicate that the substance was contained in an envelope. (Tr. A 54). During cross-examination, Marx explained that the notation concerning the "baggie" likely referred to the evidence bag into which he had placed the envelope containing the substance. (Tr. A 55, 58).

approximately four grams of a white, powdery substance.  (Tr. A 16, 44, 46).  According to

Marx, McAuley stated, "That is meth," but Marx could not recall whether he had first asked

McAuley what was in the envelope.  (Tr. A 16, 47).  According to Marx, he did not perform any

field testing on the substance and did not know whether the substance had subsequently been

tested.  (Tr. A 44-45).

As Marx continued to remove papers and receipts from McAuley's pockets, he

observed an extinguished "marijuana joint" on the ground at McAuley's feet.  (Tr. A 17, 47-49).

According to Marx, he suspected that the joint contained marijuana because it contained a green

leafy substance that smelled like marijuana.  (Tr. A 70-71).  Marx testified that he placed the

"marijuana roach" into an evidence bag, but did not believe that it was field tested.  (Tr. A 49).

According to Marx, he had not previously noticed the joint and asked McAuley whether it had

fallen out of his pocket during the search, although Marx had not seen it fall.  (Tr. A 17, 48-49).

McAuley responded that he "didn't know."[8]  (*Id.*).  Marx asked McAuley whether he would "test

positive" for marijuana.  (Tr. A 17-18).  According to Marx, McAuley responded, "I will test

positive for everything[;] I am coming from a Hell's Angels party."  (Tr. A 18, 60).

Marx then placed McAuley under arrest for:  (1) possession of methamphetamine,

a third degree felony in violation of Utah Criminal Code § 58-37-8; (2) possession of marijuana,

a class B misdemeanor in violation of Utah Criminal Code § 58-37-8; and, (3) driving under the

influence of a metabolite, a class B misdemeanor in violation of Utah Criminal Code

---

[8]  The government represented that it does not plan to offer evidence of this statement or the marijuana joint at trial.  (Docket # 431 at 13 n.7).

§ 41-6a-517.[9]  (Tr. A 19-22).  Marx testified that the Utah Criminal Code authorizes an individual to be arrested where probable cause exists to believe that the individual was driving with "an illegal drug in [his] system that hasn't metabolized" due to recent ingestion.  (Tr. A 20, 62).  Marx explained that both marijuana and methamphetamine use may result in the presence of metabolites in an individual's system even if the use does not cause impairment.  (Tr. A 20-21).  Marx testified that he did not ask McAuley to perform any field sobriety tests because he did not believe that McAuley was impaired to the degree that would cause him to fail the tests or be unsafe to drive.  (Tr. A 50-51).

According to Marx, he handcuffed McAuley and informed him that he was being arrested on the three charges specified above.  (Tr. A 23).  Marx testified that his usual and customary practice was to thoroughly search an arrestee before placing him into his police vehicle.  (Tr. A 63).  At the time of the hearing, Marx could not recall conducting a second search of McAuley, but could think of no reason that he would have deviated from the usual procedure.  (Tr. A 63-64).  After McAuley was placed into the car, Marx began to ask him questions in order to complete paperwork.  (Tr. A 23).  Among other things, Marx asked about the vehicle's registration and insurance.  (Tr. A 24).  Marx testified that he had observed a sticker on the license plate indicating an expired registration.  (*Id.*).  According to Marx, McAuley told him that he had just purchased the vehicle and had not registered it, but had insured it.  (Tr. A 25).  Marx ordered a tow truck to the scene to impound the vehicle.  (*Id.*).

---

[9]  The government's submission and Marx's testimony refer to Utah Code § 41-6-44; however, the correct statute at the time of McAuley's arrest was § 41-6-44.6.  That statute was renumbered effective February 2, 2005 and now appears at Utah Code § 41-6a-517.

Marx then took McAuley to a nearby fire station in order to have McAuley's blood drawn, a procedure to which McAuley had verbally consented.  (Tr. A 25-26, 53).  After the blood draw, which occurred at approximately 10:39 a.m., Marx transported McAuley to the Tooele County Jail and arrived about fifteen minutes later.  (Tr. A 26-28).  According to Marx, he placed him in a pre-booking room and solicited pedigree information from McAuley in order to complete a DUI report form.  (Tr. A 27-29; Government's Exhibit ("G. Ex.") 2).

After completing the front page of the form, Marx read verbatim the *Miranda* warnings from the third page of the form.[10]  (Tr. A 29).  According to Marx, as he read each right aloud, he placed a check mark next to the right on the form to indicate that he had read that right.  (Tr. A 29, 67-68).  After reading each of the rights, Marx read the next portion of the form to determine whether McAuley understood his rights.[11]  (Tr. A 30).  According to Marx, McAuley responded in the affirmative, and McAuley noted his response on the form.  (*Id.*).  Marx did not

---

[10]  The "DUI Report Form" provided:

    1.      You have the right to remain silent.

    2.       Anything you say can and will be used against you in a court of law.

    3.      You have the right to talk to a lawyer and have him/her present with you while you are being questioned.  If you cannot afford to hire a lawyer, one will be appointed to represent you before any questioning, if you wish.

    4.      If you decide to answer questions now without having counsel present, you may stop answering questions at any time.  Also, you may request counsel at any time during questioning.

(G. Ex. 2).

[11]  The "DUI Report Form" contained two questions:

    1.      Do you understand each of these rights I have explained to you?

    2.      Having these rights in mind, do you wish to talk to us now?

(G. Ex. 2).

recall reading aloud the second question on the form; instead, he believes that he asked McAuley, "Do you mind if I ask you some questions?"[12]  (Tr. A 30-32, 55-57).  According to Marx, he then began to question McAuley, noting his responses on the DUI form.  (Tr. A 32-33).  Marx testified that McAuley never asked for a lawyer or indicated that he did not want to speak to Marx.  (Tr. A 33).

Marx initially testified that if he had not discovered the envelope of suspected methamphetamine, he would have had the vehicle towed because it was not registered or insured and would have transported McAuley to a location from which someone could have picked him up.  (Tr. A 64).  He further testified that he likely would have issued McAuley a citation for possession of marijuana and would have released him on that charge.  (*Id.*).  He subsequently clarified, however, that in 2003 when McAuley was arrested, the customary practice was to arrest individuals charged with marijuana possession.  (Tr. A 64-65).  Specifically, Marx testified that he would have arrested McAuley for marijuana possession, especially because the vehicle was unregistered, and would have searched him incident to that arrest, including the pockets of his jacket.  (Tr. A 81-82).

On redirect examination, Marx testified that had he not found the methamphetamine, he still would have arrested McAuley for driving under the influence of a metabolite.  (Tr. A 72-73).  According to Marx, McAuley's behavior, coupled with his dilated pupils, would have created suspicion that he had a metabolite in his system, which, in turn,

---

[12]  Marx testified that it was his practice to omit the second question printed on the form and to state instead "I'm going to ask you some questions" or "I'm going to ask you some questions if you're ok with that."  (Tr. A 32). Marx later testified that it was his practice to ask suspects whether they "mind[ed]" if he asked them some questions. (Tr. A 57).  Marx testified that he is certain that he asked McAuley whether he minded if Marx asked him some questions.  (*Id.*).

would have led Marx to investigate further.  (*Id.*).  Marx testified that McAuley "probably would have been" charged with driving under the influence of a metabolite.  (Tr. A 73).  Marx also testified that the presence of the suspected marijuana roach at McAuley's feet, along with his physical appearance, nervous behavior and statements about testing positive, would have led Marx to arrest him for DUI metabolite.  (Tr. A 83-84).  Marx testified that if he had arrested McAuley for marijuana possession and DUI metabolite, he would have conducted a thorough search of McAuley incident to that arrest and seized the methamphetamine from his pocket. (Tr. A 84).

On recross examination, Marx was more equivocal, testifying that based upon the circumstances, McAuley either would have been arrested for DUI metabolite "[o]r at least investigated further."  (Tr. A 86).  Marx explained that probable cause to arrest for DUI metabolite does not require discovery of drugs, only "reason to believe [the individual] ha[s] used drugs and it's still in [his] system."  (Tr. A 86-87).  Finally, despite his initial testimony that he "probably" would not have performed a weapons-only search any differently from the search he did perform, he eventually conceded that he "probably" would not have searched the items in McAuley's pocket because there were no "hard objects" in the pockets and the "scope" of the two searches is different.  (Tr. A 71-72, 85-86).

### B.   McAuley's Affidavit

In support of his suppression motions, McAuley submitted a sworn affidavit stating that on November 19, 2003, as he was traveling on Interstate 80, his vehicle caught fire. (Docket # 234-8).  According to McAuley, he pulled over on the shoulder of the road and law enforcement officers were the only individuals who came within 50 yards of him.  (*Id.* at ¶ 4).

9

McAuley stated that he did not possess any illegal drugs on November 19, 2003 and that the bag that Marx removed from his jacket was empty.  (*Id.* at ¶ 5).  According to McAuley, he never consented to a search of his vehicle or his person, nor was he informed of his right to refuse consent.  (*Id.* at ¶ 6).

McAuley stated that he believed he was in custody when he was interrogated by Mott and Marx, and that neither officer read him his *Miranda* rights prior to the time that he made statements.  (*Id.* at ¶¶ 7-8).


## II.  August 23, 2005 Arrest of McAuley

This Court conducted evidentiary hearings on December 3, 2012, May 9, 2013 and May 23, 2013 concerning the circumstances surrounding McAuley's arrest on August 25, 2005.  (Docket ## 343, 410, 411).[13]  During the hearings, the government offered testimony from Robert V. DeSantis ("DeSantis"), Ronald Morse ("Morse"), James L. Riotto ("Riotto") and Frederick Bragg ("Bragg").

### A.  Testimony of DeSantis

DeSantis testified that he had been employed by the Federal Bureau of Investigation ("FBI") for over thirteen years.  (Tr. B 99).  In August 2005, DeSantis was assigned as the case agent on an investigation involving the Hell's Angels and an individual named Patrick Lawless ("Lawless"), who was a member of the Rochester charter of the Hell's Angels.  (Tr. B 100).  According to DeSantis, the investigation involved the use of a confidential informant

---

[13]  The transcript of the December 3, 2012 hearing shall be referred to as "Tr. B __." (Docket # 344).  The transcript of the May 9, 2013 hearing shall be referred to as "Tr. C __." (Docket # 418).  The transcript for the May 23, 2013 hearing shall be referred to as "Tr. D ___." (Docket # 417).

named Mitchell Austin ("Austin"), who was paid to provide information about Lawless's criminal activities.  (Tr. B 100-01).  DeSantis testified that Austin had been convicted of both state and federal felonies and had served time in both state and federal prisons.  (Tr. B 151).

DeSantis testified that in March 2005, Austin contacted the FBI to provide information about a fugitive.  (Tr. B 101, 150, 181-82).  DeSantis answered Austin's phone call and met with him the following day.  (Tr. B 150-51).  The information that Austin provided ultimately led to the arrest of the fugitive, and Austin was paid $10,000.  (Tr. B 150-51, 181-82).

During the initial meeting, Austin told DeSantis that he was a longtime acquaintance of Lawless.  (Tr. B 162).  Austin said that Lawless had wanted him to join the Hell's Angels.  (Tr. B 167-68).  DeSantis told Austin to "stay close" to Lawless and to let him know "what's going on."  (Tr. B 162, 167-68).  DeSantis testified that he repeatedly cautioned Austin against engaging in any illegal activities in connection with the investigation.  (Tr. B 164, 167).

DeSantis met with Austin at least once a month between March 2005 and August 2005 and also communicated with him by phone.  (Tr. B 153, 171).  The FBI initially paid Austin approximately $500 or 1,000 each month, but increased the amount over time; by August 2005, Austin was receiving approximately $2,000 per month.  (Tr. B 153-54).  DeSantis testified that the information Austin provided proved to be credible.  (Tr. B 155, 182).  According to DeSantis, to test Austin's truthfulness, he would question Austin about information DeSantis already knew.  (Tr. B 155-56).  DeSantis testified that he did not recall any "red flags" arising as a result of that questioning, although he felt that Austin failed to provide "full" information at times.  (*Id.*).

During a meeting on August 19, 2005, Austin informed DeSantis of a plan designed to eliminate a rival motorcycle gang known as the "Kingsmen" in Fulton, New York. (Tr. B 101-02).  According to Austin, the plan primarily involved Lawless and an individual named "Mitch."  (Tr. B 102).  At the time of the August meeting, Austin did not know Mitch's last name, but believed that he was associated with the Buffalo chapter of the Hell's Angels. (Tr. B 102, 157-58).  DeSantis testified that he later learned that Austin had met with Lawless multiple times prior to August 19, 2005 to discuss elimination of the Kingsmen.  (Tr. B 156-57). According to DeSantis, Austin did not report those meetings until August 19, 2005.  (*Id.*).

According to Austin, the Kingsmen often congregated at Gorman's Bar ("Gorman's") in Fulton, New York.  (Tr. B 102).  Lawless instructed Austin to conduct surveillance on Gorman's and to report to him whether the Kingsmen were present and how many members were there.  (*Id.*).  Austin advised DeSantis that he had driven by Gorman's and had observed members of the Kingsmen motorcycle club.  (Tr. B 103).  According to Austin, the plan was to shoot members of the Kingsmen at Gorman's.  (*Id.*).

During this same meeting, Austin provided DeSantis a .380 pistol that Lawless had given Austin.  (Tr. B 103-04).  According to Austin, Lawless gave him the pistol to use during the planned shooting at Gorman's.  (*Id.*).  At the time of the meeting, Austin was a convicted felon, and thus federal law prohibited him from possessing the pistol.  (Tr. B 151, 164, 166, 169).  Austin told DeSantis that when he first received the pistol from Lawless, it did not work properly, but he was able to fix it by removing a lodged piece of metal.  (Tr. B 104, 165-66).

12

Two days later, on August 21, 2005, DeSantis met again with Austin.  (Tr. B 104).

During that meeting, Austin informed DeSantis that Lawless had scheduled the Gorman's

shooting to occur on August 23, 2005.  (Tr. B 104-05).  According to Austin, Lawless told him

that he might be needed as a driver.  (Tr. B 105).  The plan was for Lawless and "Mitch

McAuley" to drive by Gorman's and fire as many shots as possible and then to meet Austin at a

predetermined point so that Austin could drive Lawless home, while McAuley would drive

himself to Rochester.  (*Id.*).  According to Austin, Lawless wanted to injure as many Kingsmen

members as possible in order to eliminate the gang from the Fulton area.  (Tr. B 106).

The following day, August 22, 2005, Austin had arranged to meet with Lawless at

his residence located at 216 Power Street, Solvay, New York.  (Tr. B 105-06).  Prior to the

meeting, DeSantis concealed a microphone on Austin in order to record the meeting.  (Tr. B

106).  After the meeting, Austin and DeSantis met at a predetermined location, and Austin

informed DeSantis that the shooting was still planned for the following day.  (Tr. B 107).  Austin

told DeSantis that Lawless had instructed him to drive past Gorman's before the shooting and to

provide Lawless surveillance information.  (*Id.*).

After meeting with Austin, DeSantis listened to the recording.  (Tr. B 107-08).

According to DeSantis, the conversation indicated that the shooting at Gorman's was planned for

August 23, 2005.  (Tr. B 112).  According to DeSantis, during another portion of the

conversation, Lawless explained how he planned to conduct the shooting at Gorman's.  (Tr. B

116-17).  DeSantis testified that Lawless planned to shoot at the front of the building first and to

then proceed around the side of the building to shoot anyone in the back of the building.  (Tr. B

117).  In addition, Lawless planned to dress in black so that he could not be easily identified.

13

(*Id.*).  Lawless also told Austin that he planned to disappear for a period of time after the shooting.  (*Id.*).

Lawless cautioned Austin not to panic during the shooting.  (Tr. B 118).  Lawless instructed Austin to act normally after the shooting and to go to a bar in Syracuse as if nothing had happened.  (Tr. B 119).  Lawless also told Austin that after the shooting he should go to work if he had a job and, if he did not, he should take a vacation.  (Tr. B 122).  Lawless also instructed Austin to wear gloves during the shooting.  (*Id.*).  During another part of the conversation, Austin told Lawless that the pistol he had been given had jammed, but that he had been able to fix it by removing a piece of metal.  (Tr. B 112).

Based on this information, the FBI formulated a plan to prevent the shooting.  (Tr. B 123).  According to DeSantis, the goals of the plan were two-fold:  first, and most importantly, to prevent the shooting at Gorman's without threatening public safety; and, second, to avoid revealing Austin as an informant.  (*Id.*).

DeSantis testified that the plan involved cooperation between multiple law enforcement agencies at three different locations.  The first location was Lawless's residence in Solvay, New York.  (Tr. B 125).  According to DeSantis, he, along with other law enforcement personnel, would conduct surveillance on the residence and monitor communications intercepted over a transmitter worn by Austin.  (Tr. B 125-26).  Law enforcement would also be stationed at a pre-arranged DWI checkpoint located on Route 48 in Granby, New York – the primary road between Solvay, New York and Fulton, New York.  (Tr. B 125, 144).  The checkpoint was designed to intercept Lawless and McAuley on their way to Gorman's and to prevent them from

14

arriving there.  (Tr. B 125).  Finally, a SWAT team was placed in the vicinity of Gorman's in the

event that Lawless and McAuley eluded the checkpoint.  (*Id.*).

On August 23, 2005, DeSantis met with Austin and equipped him with a

concealed transmitter.  (Tr. B 126-27).  In addition, the FBI placed a surveillance camera outside

Lawless's residence in order to transmit video to a monitor in DeSantis's vehicle.  (Tr. B 127,

173-74).

After placing the transmitter on Austin, DeSantis accompanied Austin to

Gorman's so that Austin could observe the location in accordance with Lawless's earlier

instructions.  (Tr. B 126).  During that trip, Austin received a phone call from Lawless instructing

Austin to meet him at his residence in Solvay.  (*Id.*).

At approximately 7:30 p.m., Austin and DeSantis returned to Solvay, and Austin

went to Lawless's house.  (Tr. B 127).  By monitoring Austin's concealed transmitter, DeSantis

was able to overhear the conversations between Austin and Lawless, which were also recorded.

(Tr. B 127, 131-32; G. Ex. 4).

According to DeSantis, Austin told Lawless that he had driven by Gorman's and

reported to Lawless that he had observed members of the Kingsmen at the bar.  (Tr. B 135).

Lawless told Austin that he should wear all black and, when he learned that Austin did not have

the pistol with him, instructed him to retrieve the pistol because he would need it that evening.

(Tr. B 136-37).  At approximately 8:55 p.m., Austin left Lawless's residence and met with

DeSantis in order to retrieve the pistol from DeSantis.[14]  (Tr. B 128-29, 137, 168-69).

---

[14]  According to DeSantis, he had obtained special permission to provide Austin with the pistol he was a convicted felon.  (Tr. B 169).

According to DeSantis, members of the surveillance team at Lawless's residence reported observing a black BMW arrive at the residence at approximately 10:00 p.m.  (Tr. B 130).  DeSantis observed McAuley exit the BMW and enter Lawless's residence.  (Tr. B 175-76).

Shortly thereafter, Austin returned to Lawless's residence and encountered Lawless and McAuley cleaning guns in the basement.  (Tr. B 130-31).  According to DeSantis, he overheard Austin greet McAuley and Lawless instruct Austin how to clean his gun with glass cleaner.  (Tr. B 139-40).

According to DeSantis, Lawless explained to Austin the plan for the evening. DeSantis testified that Lawless provided the route to the location where Austin was to retrieve Lawless after the shooting.  (Tr. B 142-43).  DeSantis then heard Austin describe the individuals whom he had observed during his earlier surveillance of Gorman's.  (Tr. B 143).

At approximately 10:30 p.m., DeSantis observed three individuals leave Lawless's residence.  (Tr. B 145).  According to DeSantis, McAuley and Lawless entered the black BMW, and Austin entered his own vehicle.  (Tr. B 146).  DeSantis followed the vehicles in his own vehicle, while continuing to receive transmissions from Austin, who periodically stated his location aloud in accordance with DeSantis's earlier instructions.  (*Id.*).  According to DeSantis, the two vehicles were also monitored by air surveillance.  (*Id.*).

From time to time during the drive, DeSantis spoke to Austin by cell phone to confirm his location.  (Tr. B 147).  During those conversations, Austin informed DeSantis that McAuley and Lawless had their guns with them in their vehicle.  (Tr. B 147, 179).  According to DeSantis, he communicated pertinent information to Bragg, an FBI agent located at the DWI

checkpoint, including the vehicles' locations and the fact that McAuley and Lawless had guns in the car.  (Tr. B 149).

### B.    Testimony of Bragg

Bragg testified that he had been employed as a special agent with the FBI for approximately twenty-two years.  (Tr. D 4).  In August 2005, Bragg was assigned to assist DeSantis in his investigation involving Lawless and the Hell's Angels.  (Tr. D 5).  On August 23, 2005, Bragg participated in the operation to prevent the Gorman's shooting.  (Tr. D 6-7).  According to Bragg, the New York State Police determined the best location to conduct the DWI checkpoint and ultimately chose a location on Route 48 in Granby, New York.  (Tr. D 11-13).

Bragg was the acting supervisor for the operation and was responsible for coordinating between the various law enforcement entities involved.  (Tr. D 14-15).  In that role, Bragg communicated with the FBI surveillance teams and with DeSantis via encrypted radio and cell phone.  (Tr. D 15-16).  According to Bragg, he relayed the information that he received to the law enforcement officers at the checkpoint.  (Tr. D 16).  Specifically, Bragg relayed information concerning the location of the two vehicles heading to Gorman's, the identities of the individuals in the vehicles and the fact that the first vehicle contained weapons.  (Tr. D 18-19).  Specifically, Bragg informed the State Police that the plan was underway, that a black BMW sedan containing "Mitch" and Lawless was approaching the checkpoint and that firearms were inside the vehicle.  (Tr. D 19-21).

### C.    Testimony of Riotto

Riotto testified that he had been employed as a state trooper with the New York State Police for approximately seven years.  (Tr. C 3).  He terminated his employment with the

State Police in 2007.  (*Id.*).  On August 23, 2005, Riotto was assigned to the Granby DWI

checkpoint and had attended an earlier briefing about the planned shooting of members of a rival

motorcycle gang at Gorman's.  (Tr. C 3-6, 22-24).

      Riotto testified that the DWI checkpoint was set up on Route 48 at approximately

9:30 p.m.  (Tr. C 6).  According to Riotto, the checkpoint was established according to standard

State Police procedure and was positioned to stop vehicles coming from both directions on Route

48.  (Tr. C 9).  Riotto testified that the checkpoint was located at the bottom of a gradual hill in

order to prevent individuals traveling north on Route 48 from observing the checkpoint until they

could no longer turn around.  (Tr. C 9-10).  The checkpoint area was illuminated by portable

lights, as well as by parking lights from a nearby retail store.  (Tr. C 16, 25).

      Riotto recalled receiving continuous updates concerning the location of the black

BMW occupied by the targets of the investigation.  (Tr. C 12-13, 26-27).  At approximately

11:10 p.m., Riotto observed a black BMW enter the checkpoint and come to a stop.  (Tr. C 14,

29).

      According to Riotto, he approached the vehicle and observed two male occupants.

(Tr. C 15).  The driver of the vehicle was subsequently identified as McAuley, and the passenger

was identified as Lawless.  (*Id.*).  Riotto testified that he approached the vehicle and spoke with

the driver of the vehicle, but could not recall their conversation.  (Tr. C 14, 16-17, 30).  Riotto

detected an odor of alcohol on McAuley's breath and noticed that McAuley's eyes appeared

glossy.  (Tr. C 17).  At that point, Riotto asked McAuley to exit the vehicle.  (Tr. C 18, 30).

      Riotto testified that he led McAuley towards the back of the vehicle in order to

conduct a field sobriety test.  (Tr. C 18).  Shortly thereafter, Riotto heard a member of law

enforcement yell "gun," prompting Riotto to immediately handcuff McAuley.  (Tr. C 18-19).

After McAuley was secured, Riotto returned to the BMW and conducted a search of the vehicle.

(Tr. C 20).  During the search, Riotto recovered a revolver from underneath the front passenger

seat.  (Tr. C 19-21).  According to Riotto, another revolver was discovered inside the vehicle, and

a shotgun was discovered inside the trunk of the vehicle.[15]  (*Id.*).

### D.   Testimony of Morse

Morse testified that prior to his retirement he had been employed as a trooper and

as a canine handler with the New York State Police for approximately twenty-three years.  (Tr. B

184).  On August 23, 2005, Morse was assigned to assist the FBI with the DWI checkpoint on

Route 48 in Granby, New York.  (Tr. B 184-86).  According to Morse, the checkpoint was set up

at approximately 9:30 p.m., and he was present with a police dog.  (Tr. B 186-87).  Morse

testified that he received information regarding the suspect vehicle from his lieutenant, who was

communicating directly with the FBI.  (Tr. B 187-88).

According to Morse, the lieutenant told him that the suspect vehicle was a black

BMW occupied by two white males who were believed to be carrying weapons.  (Tr. B 188-89).

Morse testified that he received various updates concerning the location of the black BMW as it

approached the checkpoint.  (Tr. B 189).  According to Morse, he observed the black BMW crest

a hill to the south of the checkpoint and come to a stop before pulling slowly into the checkpoint

area.  (Tr. B 189-90).  Morse observed Riotto approach the vehicle, ask the driver whether he had

had anything to drink and then ask the driver to exit the vehicle.  (Tr. B 190).  According to

---

[15]  During the May 23, 2013 hearing, the parties agreed that McAuley was not challenging the precise locations in the car from which the guns were recovered.  (Tr. D 2-3).  Accordingly, the government did not present witnesses to testify as to the precise locations where the guns were located.  (*Id.*).

Morse, another officer asked the passenger to exit the vehicle.  (Tr. B 191).  Morse testified that

both of the front doors were left open after the individuals exited the vehicle.  (*Id.*).

Once the individuals had exited, Morse walked the dog along the driver's side of

the vehicle.  (*Id.*).  As he passed the door, Morse looked inside and observed the handle of a gun

lodged between the driver's seat and the center console.  (Tr. B 191-92, 195-97).  According to

Morse, he stuck his head into the driver's side door to confirm what he saw and recognized the

handle, hammer and part of the cylinder of a gun.  (Tr. B 192-93).  At that time, he announced

that there was a gun in the car.  (*Id.*).  Morse testified that he was able to observe the handle of

the gun without using a flashlight.  (Tr. B 193, 200).  According to Morse, the occupants of the

car were taken into custody.  (Tr. B 194).

### E.      McAuley's Affidavit

In support of his suppression motions, McAuley submitted an affidavit stating that

on August 23, 2005, as his vehicle entered the DWI checkpoint, he was wearing a seatbelt.

(Docket # 234-8 at ¶ 9).  In addition, according to McAuley, he had not consumed any alcohol

prior to operating his vehicle on that date and disputed that his breath smelled like alcohol.  (*Id.*).

### DISCUSSION

## I.      Double Jeopardy

I turn first to McAuley's motion seeking dismissal of the indictment against him

on the grounds of double jeopardy and because it allegedly violates the terms of a 2007 plea

agreement between McAuley and the United States Attorney for the Northern District of New

York.

A.      **NDNY Indictment and Plea Agreement**

On June 13, 2007, a grand jury in the Northern District of New York returned a superseding indictment (the "NDNY Indictment") against McAuley, Lawless, David M. Lust ("Lust"), Dominic Bonanza ("Bonanza") and Helen Lawless.  (Docket # 234-3).  In relevant part, the NDNY Indictment alleged that Lawless and McAuley were members of the Hell's Angels Motorcycle Club, Rochester Charter.  (*Id.* at ¶¶ 3-4).  The indictment charged that the Hell's Angels was an enterprise engaged in racketeering activities, specifically narcotics trafficking and extortion.  (*Id.* at ¶¶ 6-9).  The indictment further alleged that the Hell's Angels claimed to control portions of territory in upstate New York and expected other motorcycle clubs within this territory "to request and receive their permission to 'fly their colors.'"  (*Id.* at ¶ 6).  According to the indictment, the Hell's Angels members used violence and threats of violence to promote and protect its criminal activities and to establish control within its territory.  (*Id.* at ¶ 8).

McAuley and Lawless were charged in Counts One through Three of the NDNY Indictment.  (*Id.* at ¶¶ 10-15).  Each of those counts arose out of the alleged plot to assassinate members of the Kingsmen motorcycle club on August 23, 2005.  (*Id.*).  The first count charged McAuley and Lawless with conspiring to commit murder or assault with a dangerous weapon in aid of racketeering, in violation of the VICAR statute, 18 U.S.C. §§ 1959(a)(5) and (6) (hereafter the "VICAR murder conspiracy charge").  (*Id.*).  The second count charged McAuley and Lawless with being felons in possession of firearms on August 23, 2005, in violation of 18 U.S.C. §§ 922(g)(a) and 2.  The third count charged McAuley and Lawless with possessing

21

firearms on August 23, 2005 in furtherance of their conspiracy to commit murder or assault with a dangerous weapon in aid of racketeering, in violation of 18 U.S.C. §§ 924(c)(1)(A)(i) and 2.[16]

On October 17, 2007, McAuley executed a plea agreement with the United States Attorney for the Northern District in order to resolve the charges in the NDNY Indictment. (Docket # 234-4). McAuley agreed to plead guilty to the VICAR murder conspiracy charge, a violation of 18 U.S.C. § 1959(a)(5). (*Id.* at ¶ 1). Specifically, McAuley admitted that he was a member of the Hell's Angels on August 23, 2005. (*Id.* at ¶ 5). In addition, McAuley admitted that the Hell's Angels was an enterprise engaged in extortion, a racketeering activity. (*Id.*). Finally, McAuley admitted that in order to maintain his position in the Hell's Angels, he agreed to assist in a plan to commit murder on August 23, 2005. (*Id.*). The plea agreement specifically authorized the United States to use McAuley's factual admissions in any subsequent criminal or civil proceeding. (*Id.* at ¶ 6).

In exchange, the "United States Attorney's Office for the Northern District of New York" agreed to seek dismissal of the remaining counts of the indictment against McAuley. (*Id.* at ¶ 7(a)). In addition, it agreed that it would "bring no further federal criminal charges against [McAuley] relating to the conduct in the Northern District of New York, committed before the date of this Agreement, which is described in Count One . . . and [McAuley's] admissions in paragraph 5." The plea agreement further provided, "This Agreement is limited to

---

[16] Count Four of the NDNY Indictment charged Helen Lawless with making a false statement to a governmental agency, in violation of 18 U.S.C. § 1001(a)(2). Specifically, the indictment alleged that Helen Lawless falsely told an FBI agent that she had never observed Lawless in possession of a firearm. (*Id.* at ¶ 16). The fifth count charged Lawless with possessing cocaine, in violation of 21 U.S.C. § 844(a). (*Id.* at ¶ 17). The sixth count of the indictment charged Lawless, Lust and Bonanza with conspiracy to threaten to commit VICAR assault, in violation of 18 U.S.C. § 1959(a)(4). (*Id.* at ¶ 18). Specifically, the indictment alleged numerous threatening acts by Lawless, Lust and Bonanza against members of rival motorcycle clubs. (*Id.*).

the U[nited] S[tates] Attorney's Office for the Northern District of New York and cannot bind

other federal, state or local prosecuting authorities." (*Id.* at ¶ 8).

    **B.**    **WDNY Superseding Indictment**

        As described above, on February 16, 2012, a grand jury sitting in the Western

District of New York returned the pending superseding indictment against McAuley and the

other defendants (the "WDNY Indictment"). (Docket # 126). It alleges that McAuley, Moran,

Riedman, Stone and Tata were members or associates of the Hell's Angels. (*Id.* at 3-4, ¶¶ 1-4).

The indictment charges that the Hell's Angels was a criminal enterprise engaged in racketeering

activity, including narcotics trafficking and murder. (*Id.* at 3-4, ¶ 1; 6, ¶ 7). Like the NDNY

Indictment, the WDNY Indictment alleges that the Hell's Angels claim to control portions of

territory in upstate New York and expect other motorcycle clubs within this territory "to request

and receive permission to 'fly their colors.'" (*Id.* at 5, ¶ 5). The indictment charges that the

Hell's Angels members use violence and threats of violence to promote and protect its criminal

activities and to establish control within its territory. (*Id.* at 5, ¶ 6).

        As set forth earlier, McAuley is charged in the first and third counts of the WDNY

Indictment. The first count alleges that between 2002 and 2010, McAuley, Mar, Boon, Riedman,

Montgomery, Tyler and Griffin conspired to distribute methamphetamine, in violation of 21

U.S.C. §§ 841(a)(1) and (b)(1)(A) (hereinafter referred to as the "narcotics conspiracy charge").

(*Id.* at 2). The third count relates to an alleged assault that occurred on May 31, 2006 in the

Western District of New York. (*Id.* at 6, ¶ 8). It charges that McAuley, Moran and Tata

committed, or aided and abetted the commission of, that assault with a dangerous weapon in

order to maintain or increase their position in the Hell's Angels enterprise, in violation of the

VICAR statute, 18 U.S.C. §§ 1959(a)(3) and 2 (hereafter referred to as the "VICAR assault charge").  The indictment further alleges that the assault was committed using a baseball bat against a patron of Spenders Bar, in Rochester, New York, after the patron allegedly threatened to kill a member of the Hell's Angels.  (*Id.* at 7-8, ¶ 3).

## C.  Double Jeopardy

McAuley contends that his conviction on the VICAR murder conspiracy charged in the first count of the NDNY Indictment bars him from prosecution on the narcotics conspiracy[17] and the VICAR assault charges in the WDNY Indictment (Counts One and Three, respectively).  (Docket ## 234-1 at ¶¶ 5, 11; 234-9 at 6-9).  According to McAuley, the conspiracies alleged in the NDNY and the WDNY Indictments are virtually identical.  (Docket ## 234-1 at ¶¶ 5, 10-11; 234-9 at 6, 8).  Although conceding that the "overt acts" charged against him in the two indictment are different, McAuley contends that because both indictments charge him with the same conspiracy – membership in the Hell's Angels enterprise – the prohibition against double jeopardy bars his prosecution in the WDNY Indictment.  (*Id.*).  McAuley also maintains that his NDNY plea agreement bars his prosecution on the WDNY Indictment.  (Docket ## 234-1 at ¶¶ 8-11; 234-9 at 7-9).

The government contends that double jeopardy is not implicated by McAuley's prosecution for the narcotics conspiracy charge or the VICAR assault charge because both charges are legally and factually distinct from the VICAR murder conspiracy charge to which he

---

[17] It is not clear whether McAuley challenges his prosecution on the narcotics conspiracy on double jeopardy grounds, plea agreement grounds, or both.  The government contends that the only double jeopardy challenge raised by McAuley in his memorandum of law relates to the VICAR assault charge.  (Docket # 251 at 3 n.2).  In the interest of completeness, however, I will address any double jeopardy concerns implicated by both counts in the WDNY indictment.

previously pled guilty.  (Docket # 251 at 5-6).  In addition, the government argues that the plea

agreement binds only prosecutors in the Northern District of New York and does not foreclose

McAuley's prosecution in the Western District of New York.  (*Id.* at 8-9).  Further, according to

the government, the scope of the government's agreement to forgo prosecution is limited to

conduct arising out of the VICAR murder conspiracy charged in the NDNY Indictment and does

not preclude McAuley's prosecution for a separate VICAR crime or narcotics conspiracy.  (*Id.* at

9-11).

      The Fifth Amendment provides that no person shall "be subject for the same

offence to be twice put in jeopardy of life or limb."  U.S. CONST. AMEND. V.  Referred to as the

Double Jeopardy Clause, this provision "protects against both multiple punishments and

successive prosecutions for the same offense, regardless of whether a first prosecution resulted in

conviction or acquittal."  *United States v. Basciano*, 599 F.3d 184, 196 (2d Cir. 2010).  Where

successive prosecutions are involved, "the critical inquiry is whether the offenses are 'the same

in fact and in law.'"  *Id.* (quoting *United States v. Estrada*, 320 F.3d 173, 180 (2d Cir. 2003)).

      The Second Circuit employs different tests to assess double jeopardy depending

upon whether the charges at issue arise under the same statutory offenses or under separate

statutes.  *See id.*  Where the conduct at issue implicates two different statutory offenses, "the test

to be applied to determine whether there are two offenses or only one, is whether each provision

requires proof of a fact which the other does not."  *Blockburger v. United States*, 284 U.S. 299,

304 (1932).  Referred to as the "same-elements" test, the focus of the analysis is a determination

of whether the two crimes are identical in a legal sense.  *See United States v. Basciano*, 599 F.3d

at 196 (citing *United States v. Chacko*, 169 F.3d 140, 146 (2d Cir. 1999)).  Here, "the critical

double jeopardy inquiry is not factual, *i.e.*, whether the same conduct is at issue in charges

brought under different statutes, but legal, *i.e.*, 'whether the 'offense' – in the legal sense, as

defined by Congress – complained of in one count is the same as that charged in another.'" *Id.*

(quoting *United States v. Chacko*, 169 F.3d at 146).

     The same-elements test requires comparison of the charges to determine whether

they "require proof of different elements and, therefore, are legally distinct." *See id.* at 198

(citing *United States v. Dixon*, 509 U.S. 688, 696 (1992)).  If they require proof of different

elements, double jeopardy is not violated.  *Id.*  For example, a defendant may be charged with

conspiring to commit a violent crime in aid of racketeering under 18 U.S.C. § 1959(a)(5), even if

he has already been convicted of conspiring to commit a violent crime as a pattern of

racketeering under 18 U.S.C. § 1962(d).  *See id.* at 198-99; *United States v. Polanco*, 145 F.3d

536, 542 (2d Cir. 1998) ("the Second Circuit has already held that the government may prosecute

a defendant both under RICO for engaging in a pattern of racketeering activity and also under

§ 1959 for violent crimes intended to maintain or increase the defendant's position in the RICO

enterprise") (citing *United States v. Concepcion*, 983 F.2d 369, 381 (2d Cir. 1992), *cert. denied*,

510 U.S. 856 (1993)), *cert. denied*, 525 U.S. 1071 (1999).  Similarly, double jeopardy does not

bar the use of a prior conviction as a predicate act for a subsequent RICO prosecution.  *See*

*United States v. Persico*, 620 F. Supp. 836, 842-43 (S.D.N.Y.) ("[a]ny contrary interpretation of

RICO would put federal prosecutors in the untenable position, when pursuing major racketeers,

of having to choose between prosecuting either the predicate offenses or the RICO charge"),

*aff'd*, 774 F.2d 30 (2d Cir, 1985); *United States v. Bellomo*, 954 F. Supp. 630, 648 (S.D.N.Y.

1997) ("the Double Jeopardy Clause does not preclude a RICO prosecution even where all the predicate acts have been the subject of prior prosecutions").

Where the charges involve successive prosecutions under the same statute, the determination turns on whether the alleged crimes are factually distinct. *Basciano*, 599 F.3d at 197. The defendant carries the burden in the first instance of "mak[ing] a colorable showing that the crimes are the same." *Id.* If successful, the burden shifts to the government to demonstrate by a preponderance of the evidence that "a person familiar with the totality of the facts and circumstances would *not*, in fact, construe the initial [charge], at the time jeopardy attached, to cover the offense that was charged in the subsequent prosecution." *Id.* (internal quotations omitted).

When a defendant faces successive prosecutions on racketeering charges, double jeopardy concerns arise only if both "the racketeering enterprise and the pattern of racketeering elements are the same in both prosecutions." *United States v. Boyle*, 452 F. App'x 55, 57 (2d Cir. 2011), *cert. denied*, 133 S. Ct. 373 (2012). "This is because 'it is neither the enterprise standing alone nor the pattern of racketeering activity by itself which RICO criminalizes, but rather, the combination of these two elements.'" *Id.* (quoting *United States v. Pizzonia*, 577 F.3d 455, 463 (2d Cir. 2009), *cert. denied*, 558 U.S. 1115 (2010)). In evaluating whether successive racketeering charges involve the same or different patterns of racketeering activity, the Court should consider:

> (1) [t]he time of the various activities charged as parts of separate patterns; (2) the identity of the persons involved in the activities under each charge; (3) the statutory offenses charged as racketeering activities in each charge; (4) the nature and scope of the activity the government seeks to punish under each charge; and

(5) the places where the corrupt activity took place under each
charge.

*See id.* at 58 (quoting *United States v. Russotti*, 717 F.2d 27, 33 (2d Cir. 1983), *cert. denied*, 465

U.S. 1022 (1984)).[18]

Having carefully reviewed the allegations in both indictments, I conclude that the

WDNY charges are both legally and factually distinct from the NDNY charges.  As an initial

matter, I easily conclude that the narcotics conspiracy alleged in the first count of the WDNY

Indictment is legally distinct from the VICAR murder conspiracy charged in the first count of the

NDNY Indictment.  Prosecution of the narcotics conspiracy charge under 21 U.S.C. § 846

requires proof of "an agreement between two or more persons to commit an offense under

subchapter I of the Drug Abuse Prevention and Control Act, 21 U.S.C. 801 et seq.; knowledge of

the existence of a conspiracy; and an intent to participate in the unlawful enterprise." *Irizarry v.*

*United States*, 508 F.2d 960, 966 (2d Cir. 1974); *United States v. Medrano*, 511 F. App'x 40, 41

(2d Cir. 2013) (under 21 U.S.C. § 846, the government must prove "the existence of [such] a

conspiracy and the defendant's willful joining it").  In contrast, prosecution of the VICAR

---

[18]  When a case involves successive conspiracy prosecutions, as opposed to successive RICO prosecutions, the Second Circuit applies similar factors to determine whether the successive conspiracy prosecution violates double jeopardy ("the *Korfant* factors").  *United States v. Gunn*, 366 F. App'x 215, 217 (2d Cir. 2010) (citing *United States v. Estrada*, 320 F.3d at 180 and *United States v. Korfant*, 771 F.2d 660, 662 (2d Cir. 1985)).  These factors include:

> (1) the criminal offense charged in the successive indictments; (2) the overlap of
> participants; (3) the overlap of time; (4) the similarity of operation; (5) the
> existence of common overt acts; (6) the geographic scope of the alleged
> conspiracies or location where overt acts occurred; (7) common objectives; and
> (8) the degree of interdependence between alleged distinct conspiracies.

*Id.*  These factors are to be considered "with the lively awareness that no dominant factor or single touchstone determines whether the compared conspiracies are in law and fact the same."  *Estrada*, 320 F.3d at 181 (internal quotations omitted).

murder conspiracy charge requires proof, *inter alia*, "that the defendant (1) agreed with others to commit a violent crime – either murder or kidnapping, *see* § 1959(a)(5), or maiming or specified assaults, *see* § 1959(a)(6) – and (2) entered into that agreement 'for the purpose of gaining entrance to or maintaining or increasing position in an enterprise engaged in racketeering activity.'" *Basciano*, 599 F.3d at 198-99 (quoting 18 U.S.C. §§ 1959(a)(5) and (6)). In other words, the narcotics conspiracy charge requires proof that McAuley entered into an agreement to distribute narcotics, while the VICAR conspiracy charge requires proof that McAuley entered an agreement to commit a violent crime. Further, the VICAR murder conspiracy charge, unlike the narcotics conspiracy charge, requires proof that McAuley entered into the agreement in order to maintain or increase his status in the Hell's Angels. Thus, the two charges require proof of different elements and do not implicate double jeopardy.

That the racketeering activity alleged in the NDNY Indictment included narcotics trafficking does not alter the analysis. Even if the narcotics trafficking activity alleged as racketeering activity in the NDNY Indictment is the same conduct as that charged in the WDNY Indictment, double jeopardy principles do not foreclose the subsequent prosecution. *See United States v. Esposito*, 912 F.2d 60, 64-65 (3d Cir. 1990) (holding that where defendant had been acquitted of a RICO charge, the Double Jeopardy Clause did not prohibit a subsequent prosecution for the underlying predicate), *cert. denied*, 498 U.S. 1075 (1991); *United States v. Boylan*, 620 F.2d 359, 361 (2d Cir.) (prosecution and conviction of both RICO count and substantive predicate did not violate double jeopardy), *cert. denied*, 449 U.S. 833 (1980); *United States v. Kazarian*, 2012 WL 1810214, *23 (S.D.N.Y. 2012) ("[p]rosecutions for RICO and for its substantive predicates are distinct for double jeopardy purposes") (internal quotation omitted).

29

I likewise conclude that the VICAR murder conspiracy to which McAuley pled guilty in the NDNY is both legally and factually distinct from the VICAR assault charge in the pending WDNY Indictment. They are legally distinct because they involve separate subsections of the statute – each of which requires proof of different elements and carries its own punishment.[19] *See United States v. Ouimette*, 798 F.2d 47, 50 (2d Cir. 1986) ("[t]he different elements of proof required by each subsection demonstrate that, under *Blockburger*, two distinct offenses exist, carrying separate penalties that may be cumulated"), *cert. denied*, 488 U.S. 863 (1988); *United States v. Kazarian*, 2012 WL 1810214 at *21 ("[i]f the offenses charged are set

---

[19] Section 1959 (a) provides:

> Whoever, . . . for the purpose of gaining entrance to or maintaining or increasing position in an enterprise engaged in racketeering activity, murders, kidnaps, maims, assaults with a dangerous weapon, commits assault resulting in serious bodily injury upon, or threatens to commit a crime of violence against any individual in violation of the laws of any State or the United States, or attempts or conspires so to do, shall be punished –
>
> > (1) for murder, by death or life imprisonment, or a fine under this title, or both; and for kidnapping, by imprisonment for any term of years or for life, or a fine under this title, or both;
> >
> > (2) for maiming, by imprisonment for not more than thirty years or a fine under this title, or both;
> >
> > (3) for assault with a dangerous weapon or assault resulting in serious bodily injury, by imprisonment for not more than twenty years or a fine under this title, or both;
> >
> > (4) for threatening to commit a crime of violence, by imprisonment for not more than five years or a fine under this title, or both;
> >
> > (5) for attempting or conspiring to commit murder or kidnapping, by imprisonment for not more than ten years or a fine under this title, or both; and
> >
> > (6) for attempting or conspiring to commit a crime involving maiming, assault with a dangerous weapon or assault resulting in serious bodily injury, by imprisonment for not more than three years or a fine [] under this title, or both.

forth in different statutes or in distinct sections of a statute, and each section unambiguously authorizes punishment for a violation of its terms, it is ordinarily to be inferred that Congress intended to authorize punishment under each provision"); *United States v. Zhang*, 833 F. Supp. 1010, 1018 (S.D.N.Y. 1993) ("[i]n undertaking [the *Blockburger*] inquiry, individual statutory subsections may be used as the basis for comparison where Congress intended that each subsection constitute a separately punishable crime").

In the NDNY Indictment, McAuley was charged with VICAR murder conspiracy under subsections five and six of the VICAR statute, which prohibit conspiracies to commit murder or assault in aid of racketeering. *See* 18 U.S.C. §§ 1959 (a)(5) and (6). A conviction under either of these subsections requires proof of an agreement to commit a violent crime and proof that the agreement was entered into for the purpose of increasing or maintaining membership in the Hell's Angels. *See Basciano*, 599 F.3d at 199. By contrast, the WDNY Indictment charges McAuley with VICAR assault under subsection three of the statute – which prohibits assault with a dangerous weapon or resulting in serious bodily injury committed in aid of racketeering. A conviction under this subsection requires proof that McAuley participated in an assault for the purpose of increasing or maintaining membership in the Hell's Angels. Accordingly, the two subsections require proof of different elements and are legally distinct for double jeopardy purposes. *See, e.g.*, *United States v. Felix*, 503 U.S. 378, 391 (1992) (recognizing "the established doctrine that a conspiracy to commit a crime is a separate offense from the crime itself"); *United States v. Sessa*, 125 F.3d 68, 72-73 (2d Cir. 1997) ("RICO and RICO conspiracy are not the 'same offense' under *Blockburger*"), *cert. denied*, 522 U.S. 1065 (1998).

31

During oral argument, counsel for McAuley urged that double jeopardy would be violated by McAuley's pending prosecution because the government intends to offer proof of McAuley's plea to the VICAR murder conspiracy charge in order to demonstrate that the Hell's Angels engaged in racketeering activity – an element of the VICAR assault charge in this case. Double jeopardy, however, does not prohibit the government from establishing racketeering activity through proof of conduct for which McAuley previously admitted his guilt. *See Basciano*, 599 F.3d at 199 ("[t]o be sure, the violence proscribed by § 1959 may sometimes be part of a pattern of racketeering[;] . . . [n]evertheless, because distinct factual elements must be proved to establish [the two charges], a defendant may be prosecuted under both statutes without violating the Double Jeopardy Clause"); *United States v. Sessa*, 125 F.3d at 72 ("although the Double Jeopardy Clause prohibits successive prosecutions for the same *offense* (as defined in *Blockburger*), it does not bar a second prosecution based on *conduct* proved at the first trial"); *United States v. Savage*, 2012 WL 1994736, *10 (E.D. Pa. 2012) ("the overlap is not inconsistent with the well-settled law that the [g]overnment may charge previous drug conspiracies as predicate acts in RICO conspiracies"); *Palermo v. United States*, 2010 WL 3239427, *5 (S.D.N.Y. 2010) ("double jeopardy did not bar the [g]overnment from including, as a predicate act, an action that had been charged as a substantive offense in a previous trial").

At oral argument, counsel for McAuley also maintained that the double jeopardy clause would be violated by McAuley's pending prosecution because the conduct underlying the VICAR assault charge occurred before McAuley executed the NDNY plea agreement. To the contrary, "the Double Jeopardy Clause neither forbids successive prosecutions for different

offenses nor requires the government to join all possible charges arising from a course of conduct in a single indictment." *Sessa*, 125 F.3d at 73.

Even assuming that prosecution under different subsections of 18 U.S.C. § 1959(a) required proof of the same elements, the two charges are nonetheless factually distinct. *See United States v. Boyle*, 452 F. App'x at 57 ("[s]uccessive prosecutions violate the Double Jeopardy Clause only where the offenses that are the subject of both prosecutions are the same in fact and in law") (internal quotation omitted).  At best, both indictments accuse McAuley of committing acts or conspiring to commit acts for the purpose of maintaining or increasing his position in the same enterprise – "the Hell's Angels Motorcycle Club, Rochester Charter." (Docket ## 234-2 at 3-4, ¶ 1; 234-3 at ¶ 1).  That the same enterprise is charged in both indictments, however, is insufficient to warrant dismissal on double jeopardy grounds.  *See Boyle*, 452 F. App'x at 57 ("there is no double jeopardy problem unless the racketeering enterprise and the pattern of racketeering elements are the same in both prosecutions [;] . . . it is neither the enterprise standing alone nor the pattern of racketeering activity by itself which RICO criminalizes, but rather, the combination of these two elements") (internal quotation omitted); *see United States v. Tomero*, 473 F. Supp. 2d 609, 615 (S.D.N.Y. 2007) ("a conviction under RICO does not necessarily preclude a subsequent prosecution for an offense committed in connection with the same racketeering enterprise").

Significantly, the conduct at issue in each indictment is factually distinct, involved different perpetrators (other than McAuley) and victims, was undertaken at different times and occurred in different locations.  *See Boyle*, 452 F. App'x at 58 & n.2 (conduct spanned different time periods, involved different participants, implicated different statutory offenses and occurred

in different locations).  Accordingly, I conclude that "a reasonable person familiar with the

totality of the facts and circumstances would view" the two VICAR charges alleged in the two

indictments as factually distinct.  *See id.*

        I also conclude that the case relied upon by McAuley, *United States v. Mintz*, 16

F.3d 1101 (10th Cir. 1994), is inapposite.  The *Mintz* case involved successive prosecutions for

narcotics conspiracies and is thus distinguishable both on the facts and the law.  *See* 16 F.3d at

1102-03.  The Tenth Circuit addressed not only whether the offenses were identical in law, but

also whether "the two transactions were interdependent and whether the [d]efendants were united

in a common unlawful goal or purpose."  *See id.* at 1103 (internal quotation omitted).  As

discussed above, the Second Circuit applies the *Korfant* factors to analyze double jeopardy

concerns raised by successive conspiracy prosecutions.  In any event, this case, which involves

the successive prosecution of a violent crime and a conspiracy to commit a violent crime, both

committed in aid of the same racketeering enterprise, is better analyzed under the *Russotti*

factors, which are designed to address double jeopardy concerns arising from successive

prosecutions involving the same racketeering enterprise.  Accordingly, I recommend that the

district court deny McAuley's double jeopardy challenge.

    **C.**    <u>**2007 Plea Agreement**</u>

        I turn next to McAuley's argument that the pending charges breach the NDNY

plea agreement.  According to McAuley, the terms of the plea agreement prohibit the government

from prosecuting McAuley for any acts arising out of the conduct alleged in the NDNY

Indictment.  (Docket # 234-9 at 7-9).  According to McAuley, the two indictments involve the

same conspiracy – the Hell's Angels enterprise – and the government was likely aware of the

VICAR conduct charged in the WDNY Indictment prior to the execution of the plea agreement. Thus, McAuley urges, the VICAR conduct is encompassed within the terms of his NDNY plea agreement and may not be prosecuted.

"It is well-settled that a prosecutor's promises made in return for a defendant's guilty plea must be fulfilled."  *United States v. Salameh*, 152 F.3d 88, 120 (2d Cir. 1998) (citing *Mabry v. Johnson*, 467 U.S. 504, 509 (1984) ("when the prosecution breaches its promise with respect to an executed plea agreement, the defendant pleads guilty on a false premise, and hence his conviction cannot stand")), *cert. denied*, 525 U.S. 1112 (1999).  A plea agreement is interpreted "in accordance with contract law principles, with any ambiguities in the agreement resolved against the government."  *United States v. Gonzalez*, 93 F. App'x 268, 270 (2d Cir. 2004).  When determining whether the terms of a plea agreement have been breached, "a court must look to what the parties to the plea agreement reasonably understood to be its terms." *United States v. Lovaglia*, 954 F.2d 811, 817 (2d Cir. 1992).

It is equally well-settled that "[a] plea agreement binds only the office of the United States Attorney for the district in which the plea is entered unless it affirmatively appears that the agreement contemplates a broader restriction . . . or unless 'there [is] evidence to show that [a prosecutor] [i]s attempting to evade its own obligations [under the plea agreement] by transferring a prosecution' to another office."  *United States v. Gonzalez*, 93 F. App'x at 270 (internal citations omitted) (alterations in original).  This is particularly true, where, as here, the plea agreement contains language "explicitly limit[ing] its reach" and affirmatively stating that it "cannot bind other federal, state or local prosecuting authorities."  *See United States v. D'Amico*, 734 F. Supp. 2d 321, 349 (S.D.N.Y. 2010).

McAuley's plea agreement expressly provides that it binds only prosecutors from the "U[nited] S[tates] Attorney's Office for the Northern District of New York" and that it "cannot bind other federal, state or local prosecuting authorities."  (Docket # 234-4 at ¶ 8). Moreover, nothing in the record suggests that the United States Attorney for the Northern District of New York or his prosecutors sought to evade the terms of the plea agreement by transferring the prosecution to the Western District of New York.  Accordingly, I conclude that the plea agreement does not bar the United States Attorney for the Western District of New York from prosecuting McAuley for the charges alleged in the WDNY Indictment.  *See United States v. D'Amico*, 734 F. Supp. 2d at 351.

That the government intends to introduce evidence relating to the VICAR murder conspiracy charge contained in the NDNY Indictment to establish that the Hell's Angels engaged in racketeering activity – an element of the VICAR assault charged in the WDNY Indictment – does not alter the analysis.  *See United States v. Persico*, 620 F. Supp. at 846 (holding that plea agreement that expressly bound only prosecuting attorneys from one district did not preclude prosecutors from another district from using the offenses to which defendant had plead guilty to establish RICO predicate in a subsequent prosecution).  Further, I conclude that the cases cited by McAuley are inapposite because each involved prosecutions apparently initiated by the same prosecuting authority and involved interpretation of substantively different plea agreement provisions.  *See United States v. Elashyi*, 554 F.3d 480, 501 (5th Cir. 2008) (interpreting plea agreement which barred prosecution for crimes "aris[ing] out of the facts and circumstances known to the government at [the time of the plea agreement]" and that "surround[ed] [the defendant's] involvement in the crimes addressed in the . . . indictment"), *cert. denied*, 558 U.S.

829 (2009); *United States v. Bradford*, 433 F. Supp. 2d 1001, 1003 (N.D. Iowa 2006) (interpreting plea agreement which barred prosecution for criminal charges "based upon or arising from information now in our possession").

In sum, I recommend that the district court deny McAuley's motion to dismiss the charges against McAuley on the grounds that the pending prosecution violates the 2007 plea agreement.

## II.    **Sufficiency of the Indictment**

McAuley also seeks dismissal of Count Three (the VICAR assault charge) on the grounds that it is facially insufficient.  (Docket # 234-1 at ¶¶ 12-17).  According to McAuley, the indictment is insufficient because it fails to describe the contents of two telephone conversations that he allegedly had on the day of the alleged assault at Spender's Bar.  (*Id.* at ¶¶ 13-14).  In addition, according to McAuley, the indictment fails to describe or explain how the alleged assault would have assisted McAuley in maintaining or increasing his position in the Hell's Angels.  (*Id.* at ¶ 15).  Finally, McAuley contends that the indictment fails to adequately describe how the activities of the Hell's Angels affected interstate commerce.  (*Id.* at ¶ 16).

"The Federal Rules of Criminal Procedure encourage succinct criminal pleadings."  *Kazarian*, 2012 WL 1810214 at *24.  Pursuant to Rule 7(c)(1) of the Federal Rules of Criminal Procedure, an indictment "must be a plain, concise, and definite written statement of the essential facts constituting the offense charged."  Fed. R. Crim. P. 7(c)(1).  "It is well settled that 'an indictment is sufficient if it, first, contains the elements of the offense charged and fairly informs a defendant of the charge against which he must defend, and second, enables him to

plead an acquittal or conviction in bar of future prosecutions for the same offense.'" *United States v. Alfonso*, 143 F.3d 772, 776 (2d Cir. 1998) (quoting *Hamling v. United States*, 418 U.S. 87, 117 (1974)).  In other words, an indictment is sufficient if it provides the defendant "adequate notice of the charges to permit him to plead former jeopardy upon prosecution and to enable him to prepare a defense." *United States v. Hernandez*, 980 F.2d 868, 871 (2d Cir. 1992).  To accomplish this, an indictment ordinarily "need do little more than to track the language of the statute charged and state the time and place (in approximate terms) of the alleged crime." *United States v. Alfonso*, 143 F.3d at 776 (quoting *United States v. Stavroulakis*, 952 F.2d 686, 693 (2d Cir.), *cert. denied*, 504 U.S. 926 (1992)).

Having reviewed the language of Count Three, I find that it sufficiently informs McAuley of the charge against him.  The indictment alleges that on May 31, 2006, at Spenders Bar, in Rochester, New York, a patron of the bar was assaulted with a baseball bat after having threatened to kill a member of the Hell's Angels.  (Docket # 126 at 8, ¶ 3).  The indictment further alleges that Tata, Moran and McAuley, aided and abetted by each other, committed the assault for the purpose of maintaining and increasing their position in the Hell's Angels – an enterprise engaged in activities affecting interstate commerce.  (*Id.* at 4-6).  These allegations track the statutory language of 18 U.S.C. § 1959 and identify the approximate time, location and participants in the alleged offense and are thus sufficient to withstand a motion to dismiss.  *See United States v. Levy*, 2006 WL 721515, *3 (E.D.N.Y. 2006) (indictment sufficiently alleged violation of 18 U.S.C. § 1959 where it tracked the statutory language and provided the date of the alleged shooting and name of the alleged victim because it provided the defendant "with sufficient detail to inform him of the charge against which he must defend and to enable him to

plead double jeopardy in further prosecution based upon the same alleged assault"); *United States v. Booth*, 1999 WL 1192317, *7 (S.D.N.Y. 1999) ("[i]t is sufficient . . . for a § 1959 indictment to track the statutory language and to identify the approximate time and place of the alleged offense").  Equally unavailing is McAuley's contention that Count Three should be dismissed because it fails to adequately explain how the Hell's Angels' activities affected interstate commerce.  *See Phillips v. United States*, 2003 WL 21878802, *1-2 (S.D.N.Y. 2003) (indictment sufficiently alleged that the conduct affected interstate commerce where it contained an allegation that the enterprise "was engaged in and the activities of which, affected interstate and foreign commerce").  Accordingly, I recommend denial of McAuley's motion to dismiss Count Three.


III.   **Suppression of Evidence from November 2003 Arrest**

       McAuley seeks to suppress all evidence obtained during his interactions with Marx on November 19, 2003.  (Docket # 426).  Initially, McAuley's encounter with law enforcement began as a consensual encounter, arising from the officers' response to McAuley's vehicle fire.  Thus, McAuley does not seek suppression on the grounds that he was unlawfully detained.  Instead, McAuley contends that Marx unlawfully searched him because Marx had no basis to suspect that McAuley possessed a weapon and did not have authority to conduct a limited search for weapons.  (*Id.* at 5).  In addition, McAuley argues that even if reasonable suspicion had existed to permit Marx to conduct a limited frisk for weapons, Marx impermissibly conducted a full-blown search of McAuley.  (*Id.* at 10-11).  Thus, according to McAuley, any

evidence obtained during the search should be suppressed.  (*Id.*).  In the absence of such

evidence, McAuley maintains, Marx lacked probable cause to arrest him.  (*Id.* at 11-12).

   The government represents that it does not intend to offer into evidence at trial the

marijuana joint recovered from the ground.  (Docket # 431 at 13 n.7).  Thus, the only tangible

evidence at issue is the envelope of suspected methamphetamine that was seized from McAuley

during the encounter.  (*Id.*).  As to its seizure, the government contends that McAuley consented

to the search that Marx performed, which uncovered the methamphetamine.  (*Id.* at 14-16).  The

government alternatively contends that even before the search was conducted, Marx had probable

cause to arrest and would have arrested McAuley for driving under the influence of a metabolite

in violation of Utah Code § 41-6a-517, and the methamphetamine would inevitably have been

discovered during a search incident to arrest.  (*Id.* at 16-18).

  A.  **Consent to Search**

   Although the Fourth Amendment generally requires that a police officer obtain a

warrant before conducting a search of a person or private property, *Maryland v. Dyson*, 527 U.S.

465, 466 (1999) (*per curiam*) (citing *California v. Carney*, 471 U.S. 386, 390-91 (1985)), a

warrantless search is permissible if based upon voluntary consent.  *Schneckloth v. Bustamonte*,

412 U.S. 218, 222 (1973); *United States v. Elliott*, 50 F.3d 180, 185 (2d Cir. 1995), *cert. denied*,

516 U.S. 1050 (1996).  The consent need only be voluntary, that is, obtained without coercion,

even if it was given without knowledge of the right to refuse consent.  *See Schneckloth v.

Bustamonte*, 412 U.S. at 241-42; *United States v. Garcia*, 56 F.3d 418, 422 (2d Cir. 1995).

   Voluntariness is determined based upon the totality of the circumstances.

*Schneckloth*, 412 U.S. at 227; *United States v. Hernandez*, 5 F.3d 628, 632 (2d Cir. 1993);

*United States v. Kon Yu-Leung*, 910 F.2d 33, 41 (2d Cir. 1990). Among the relevant

considerations are: age, education, background, physical and mental condition, the setting in

which the consent is obtained, whether *Miranda* warnings are administered and whether the

individual has knowledge of the right to refuse consent. *See Schneckloth*, 412 U.S. at 226;

*United States v. Kon Yu-Leung*, 910 F.2d at 41. "Consent must be a product of that individual's

free and unconstrained choice, rather than a mere acquiescence in a show of authority," *United

States v. Wilson*, 11 F.3d 346, 351 (2d Cir. 1993) (citations omitted), *cert. denied*, 511 U.S. 1130

(1994), and the fact that it is obtained while the individual is in custody does not render it

involuntary, *see, e.g.*, *United States v. Arango-Correa*, 851 F.2d 54, 57 (2d Cir. 1988), although

it does "require more careful scrutiny," *United States v. Wiener*, 534 F.2d 15, 17 (2d Cir.), *cert.

denied*, 429 U.S. 820 (1976).

      The government bears the burden of establishing by a preponderance of the

evidence that the consent was voluntary. *United States v. Isiofia*, 370 F.3d 226, 230 (2d Cir.

2004); *United States v. Buettner-Janusch*, 646 F.2d 759, 764 (2d Cir.), *cert. denied*, 454 U.S. 830

(1981). "The ultimate question presented is whether the officer had a reasonable basis for

believing that there had been consent to the search." *United States v. Isiofia*, 370 F.3d at 231

(internal quotations and citations omitted).

      Considering the totality of the circumstances, I do not find that McAuley's gesture

of turning around and lifting his arms constituted an implied consent to search; rather, I conclude

that the gesture merely reflected McAuley's acquiescence to Marx's articulated authority to

conduct a weapons search without McAuley's consent. In reaching this conclusion, I have

considered caselaw upholding searches as lawful consent searches based upon an individual's

non-verbal conduct. *See, e.g.*, *United States v. Vongxay*, 594 F.3d 1111, 1119-1120 (9th Cir.)

(defendant consented to search by raising his hands to his head in response to officer's request to

search for weapons), *cert. denied*, 131 S. Ct. 294 (2010); *United States v. Chrispin*, 181 F. App'x

935, 939 (11th Cir. 2006) (per curiam) ("although [defendant] did not express his verbal assent to

be searched, his body language – turning away from [the officer] and placing his hands on the

police cruiser as if preparing to be searched – gave implied consent"); *United States v. Jones*, 254

F.3d 692, 695 (8th Cir. 2001) (affirming district court's holding that defendant's gesture of

opening his arms in response to request to search constituted an implied consent); *United States*

*v. Mendoza-Cepeda*, 250 F.3d 626, 629 (8th Cir. 2001) (defendant's gesture of raising arms in

response to request to search torso constituted implied consent); *United States v. Wilson*, 895

F.2d 168, 172 (4th Cir. 1990) (affirming finding of implied consent where defendant responded

to request to search by "shrugging his shoulders and raising his arms"); *United States v. Toole*,

2008 WL 2323362, *14 (W.D.N.Y.) (finding implied consent where defendant "extended and

raised his arms to the side" in response to officer's second request to search), *report and*

*recommendation adopted*, 2008 WL 2354959 (W.D.N.Y. 2008).  Unlike the cited authority,

however, the government in this case "has simply not met its burden of proving that [McAuley's]

consent to a search of his person was the product of a free and unconstrained choice." *See*

*United States v. Roldan*, 1997 WL 767564, *6 (S.D.N.Y. 1997).

   The encounter began when Marx approached McAuley and, after asking him

some questions about what had happened to his vehicle, informed him that the Brutons reported

observing him hide suspected narcotics in his jacket.  McAuley denied the accusation, prompting

Marx to ask him whether he could search him for drugs or weapons.  McAuley inquired what

would happen if he refused to consent.  Marx responded that he would conduct a search for weapons in any event.  McAuley did not verbally respond, but instead turned around and raised his arms to the side.

        The government urges the Court to construe McAuley's gesture as implied consent to a full-blown search for weapons and drugs.  The Second Circuit has cautioned, however, that "consent to a search is not to be inferred lightly."  *United States v. Como*, 340 F.2d 891, 893 (2d Cir. 1965).  Contrary to the government's interpretation, I find that the more reasonable construction of McAuley's gesture is an acquiescence in Marx's inevitable search.  Marx, after all, had informed McAuley that refusing consent would be futile because he was going to conduct a search for weapons.  Marx never informed McAuley that a weapons search was more limited than a drug search; indeed, Marx himself initially testified that he would not have conducted a weapons-only search any differently than a weapons and drugs search.  (Tr. A 71).  Under these circumstances, I conclude that it was unreasonable to construe McAuley's gesture as implied consent to a full-blown search of his person.  *See United States v. Worley*, 193 F.3d 380, 386 (6th Cir. 1999) (defendant's statement "[y]ou've got the badge, I guess you can" in response to officer's request to search was "merely a response conveying an expression of futility in resistance," rather than "an unequivocal statement of free and voluntary consent"); *United States v. Vasquez*, 638 F.2d 507, 527 (2d Cir. 1980) (finding that defendant's act of opening door was merely an act of acquiescence where officers presented their entry into the house "as a fait accompli", *cert. denied*, 450 U.S. 970 (1981); *United States v. Page*, 154 F. Supp. 2d 1320, 1328-29 (M.D. Tenn. 2001) (finding no lawful consent to search where defendant initially refused consent and his subsequent statement was merely "an expression of futility in resistance

43

to authority" where officer told him that in the absence of consent he would use a narcotics dog

and search if the dog alerted); *United States v. Momodu*, 909 F. Supp. 1571, 1580 (N.D. Ga.

1995) (consent not freely given where officer "made the search appear to be a *fait accompli* and

made withholding consent appear to be a futile gesture"); *United States v. Woods*, 837 F. Supp.

525, 529 (W.D.N.Y. 1993) ("[d]efendant had no reasonable option but to accompany the

agents[;] [h]is acquiescence should not be viewed as consent, but rather as a realistic assessment

of the futility of resisting their request").   Because the methamphetamine was discovered during

an unlawful search, it must be suppressed[20] – both as evidence at trial on the pending charges, as

well as evidence in support of the government's argument that probable cause existed to arrest

McAuley on November 19, 2003.   *See United States v. Lee*, 83 F.2d 195, 196 (2d Cir. 1936)

("[o]f course, the evidence illegally obtained may not be used to support the claim of probable

cause"); *see also United States v. Trzaska*, 111 F.3d 1019, 1026 (2d Cir. 1997).

        In addition to the suspected methamphetamine, Marx also discovered a marijuana

joint on the ground at McAuley's feet during the course of the unlawful search.   Although the

government does not intend to offer the marijuana as evidence at trial, its position is unclear on

whether it is relying on the marijuana in support of its probable cause to arrest argument.   In any

event,  Marx's testimony concerning the discovery of the marijuana joint reasonably suggests that

---

[20]  Even assuming that Marx was justified in conducting a limited pat-down search of McAuley for weapons pursuant to *Terry v. Ohio*, 392 U.S. 1, 29 (1968), – a justification that the government does not urge in its papers – Marx testified that he could not recall feeling anything other than papers in McAuley's pockets during the pat-down. Thus, he exceeded the limited scope of his authority under *Terry* by reaching into McAuley's pocket to remove the envelope containing the alleged methamphetamine and the other papers and receipts contained in the pocket.  *See United States v. Santillian*, 2013 WL 4017167, *11 (S.D.N.Y. 2013) ("the limits of a *Terry* protective search are . . . well established[;] . . . while *Terry* entitled [the officer] 'to place his hands on [defendants'] pants and to feel the [contents] in the pockets, [the officer's] continued exploration of the pockets after he concluded that [they] contained no weapon was unrelated to the sole justification for the search under *Terry* and thus invalid'") (quoting *Minnesota v. Dickerson*, 508 U.S. 366, 367 (1993)).

the marijuana joint fell from McAuley's pocket during Marx's search.  Marx testified that he did

not recall seeing it before the search and, in fact, when he did see it, he asked McAuley "if that

was his marijuana joint that had fallen out."  (Tr. A 17).  This testimony, in my estimation,

prevents the government from proving that the joint's discovery on the ground was the result of

something other than the unlawful search and precludes the government from relying on the

marijuana evidence as part of its probable cause to arrest argument.

### B.        Statements Made During the Search of McAuley

McAuley made several statements during the course of Marx's unlawful search,

some of which the government seeks to introduce at trial and which arguably support the

government's position that Marx had probable cause to arrest McAuley.  Accordingly, the Court

now addresses whether those statements should be suppressed as fruit of the unlawful search.

The statements the Court has identified are as follows:  (1) "That's meth" – which was made by

McAuley almost immediately after Marx looked inside the envelope he removed from

McAuley's pocket and which may have been made in response to a question by Marx about the

contents of the envelope[21]; (2) "I don't know"[22] – which was made in response to Marx's

question regarding whether the marijuana joint fell from McAuley's pocket; and, (3) "I will test

positive for everything[;] I'm coming from a Hell's Angels party" – which was made in response

to Marx's question regarding whether McAuley would test positive for marijuana use.

---

[21]   The government does not maintain that this was a spontaneous statement, presumably because Marx
testified that he could not recall whether he had elicited the statement by asking McAuley what was contained in the
envelope.

[22]   The government has indicated that it will not seek to introduce the second statement.  (Docket # 431 at
13 n.7).  Despite this, the government has not disavowed reliance on the statement in support of its probable cause
argument, and thus the Court will determine whether it should be suppressed.

McAuley contends that these statements should be suppressed as fruit of Marx's unlawful search.  The government notes that McAuley "does not challenge the admissibility of these statements on *Miranda* grounds," but does not otherwise address the fruit of the poisonous tree argument.  (Docket # 431 at 18).

Evidence seized pursuant to an unlawful seizure or search must be suppressed as the fruit of the poisonous tree.  *See Wong Sun v. United States*, 371 U.S. 471, 484-85 (1963); *United States v. Scopo*, 19 F.3d 777, 781 (2d Cir.), *cert. denied*, 513 U.S. 877 (1994).  "The exclusionary rule prohibits introduction into evidence of tangible materials seized during an unlawful search, and of testimony concerning knowledge acquired during an unlawful search." *Murray v. United States*, 487 U.S. 533, 536-37 (1988) (internal citations omitted).  This doctrine applies not only to direct evidence, but also to tangible and testimonial evidence derived from the primary evidence.  *Id.* at 537.  Thus, any evidence acquired as an indirect product of an illegal search must be suppressed "up to the point at which the connection with the unlawful search becomes so attenuated as to dissipate the taint."  *Id.* (internal quotation omitted).  The factors to be analyzed in connection with this attenuation analysis are:  "(1) the administration of the *Miranda* warnings, (2) the temporal proximity between the Fourth Amendment violation and the statements, (3) the presence of intervening circumstances, and (4) the purpose and flagrancy of the official misconduct."  *United States v. Guzman*, 724 F. Supp. 2d 434, 444 (S.D.N.Y. 2010) (citing *Mosby v. Senkowski*, 470 F.3d 515, 521 (2d Cir. 2006), *cert. denied*, 552 U.S. 836 (2007)).

The government bears the burden of proving that "the statements were sufficiently attenuated to remove the taint from the unlawful search."  *United States v. Guzman*, 724

46

F. Supp. 2d at 444.  Although neither party has directly addressed the issue of attenuation, I find

that the record before the Court is sufficient to allow the Court to conduct its own attenuation

analysis.

With respect to the first factor, Marx testified that he did not administer the

*Miranda* warnings until after he had transported McAuley to the jail, which occurred after the

unlawful search was conducted and the statements at issue were made; thus, this factor weighs in

favor of suppression.  The second and third factors likewise weigh in favor of suppression as the

statements were made during the course of the unlawful search, after McAuley was confronted

with items discovered during the search[23] and in the absence of any intervening circumstances.  I

conclude that the final factor weighs slightly in favor of the government.  Although Marx's

search was unlawful, his actions do not appear to have been taken in bad faith.  Weighing the

four factors in their totality, the balance tips in favor of suppression.  *See United States v.*

*Lawson*, 2013 WL 4407100, *10 (W.D.N.Y. 2013) (suppressing statements made by defendant

after unlawful search); *United States v. Griswold*, 2011 WL 7473466, *11 (W.D.N.Y. 2011)

("[o]f the various fruits present on the poisonous tree, perhaps the most easily identifiable is a

confession resulting from an illegal search"); *Guzman*, 724 F. Supp. 2d at 443-44 (suppressing

statement made immediately after officers conducted an unlawful search).

**C.     Inevitable Discovery of Tangible Evidence**

Having concluded that Marx unlawfully conducted a full-blown search of

McAuley without consent, I now turn to the government's alternative argument that Marx would

---

[23]  As discussed above, I conclude that the circumstances surrounding Marx's discovery of the marijuana joint lead to the reasonable inference that the marijuana joint fell from McAuley's pocket as a result of Marx's unlawful search.

47

have discovered the suspected methamphetamine in McAuley's pocket during the course of a

lawful search incident to McAuley's arrest for driving under the influence of a metabolite.[24]

The inevitable discovery exception to the exclusionary rule "allows evidence

initially detected as the result of unlawful government conduct to be introduced nonetheless 'if

the prosecution can establish by a preponderance of the evidence that the information ultimately

or inevitably would have been discovered by lawful means.'" *United States v. Whitehorn*, 829

F.2d 1225, 1230 (2d Cir. 1987) (quoting *Nix v. Williams*, 467 U.S. 431, 444 (1984)), *cert. denied*,

487 U.S. 1237 (1988).  In applying this exception, the court must determine, "viewing affairs as

they existed at the instant before the unlawful search, what *would have happened* had the

unlawful search never occurred." *United States v. Eng*, 971 F.2d 854, 861 (2d Cir. 1992).

"[P]roof of inevitable discovery 'involves no speculative elements but focuses on demonstrated

historical facts capable of ready verification or impeachment and does not require a departure

from the usual burden of proof at suppression hearings.'" *Id.* (emphasis omitted) (quoting *Nix v.*

*Williams*, 467 U.S. at 444).  As the Supreme Court explained in *Nix*:

> [T]he interest of society in deterring unlawful police conduct and
> the public interest in having juries receive all probative evidence of
> a crime are properly balanced by putting the police in the same, not
> a worse, position that they would have been in if no police error or
> misconduct had occurred.

*Nix*, 467 U.S. at 443.

Where the government seeks to admit evidence illegally obtained pursuant to an

unlawful search under the theory that the defendant would have been inevitably arrested and

---

[24] As the government does not intend to offer the marijuana into evidence, this Court does not address its seizure under the inevitable discovery doctrine.

lawfully searched incident to that arrest, the inquiry requires the government to prove: "(a) that law enforcement officers *could have* validly arrested [the defendant] . . . , and (b) that law enforcement officers . . . *would have* arrested [the defendant]." *United States v. Heath*, 455 F.3d 52, 55 (2d Cir. 2006). Accordingly, disregarding the evidence uncovered during the unlawful search of McAuley, the government must show both that Marx had probable cause to arrest McAuley and would have arrested McAuley. The government's evidence must convince the Court "with a high level of confidence, that each of the[se] contingencies" would have occurred. *See United States v. Heath*, 455 F.3d at 60.

        Probable cause to arrest exists when the arresting officer has "knowledge or reasonably trustworthy information of facts and circumstances that are sufficient to warrant a person of reasonable caution in the belief that the person to be arrested has committed or is committing a crime." *United States v. Delossantos*, 536 F.3d 155, 158 (2d Cir.) (internal quotations omitted), *cert. denied*, 555 U.S. 1056 (2008). The Supreme Court has counseled that the probable cause standard is "a 'practical, nontechnical conception' that deals with 'the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act.'" *Maryland v. Pringle*, 540 U.S. 366, 370 (2003) (quoting *Illinois v. Gates*, 462 U.S. 213, 231 (1983)). In determining whether probable cause exists for an arrest, a reviewing court must examine the totality of circumstances surrounding the arrest, *Illinois v. Gates*, 462 U.S. at 230-31, judged from "the perspective of a reasonable police officer in light of his training and experience." *United States v. Delossantos*, 536 F.3d at 159. Probable cause requires no more and no less than a "reasonable ground for belief of guilt." *Maryland v. Pringle*, 540 U.S. at 371 (quoting *Brinegar v. United States*, 338 U.S. 160, 175 (1949)).

Here, the government argues that even if the narcotics and incriminating statements are suppressed, probable cause still existed for McAuley's arrest for driving under the influence of a metabolite in violation of Utah Code § 41-6a-517.  That statute provides that "in cases not amounting to a violation of [driving under the influence of drugs], a person may not operate or be in actual physical control of a motor vehicle within this state if the person has any measurable controlled substance or metabolite of a controlled substance in the person's body." Utah Criminal Code § 41-6a-517.  The government's submission does not address the second contingency identified above – whether, even if probable cause to arrest had existed, Marx *would have* arrested McAuley based upon the non-suppressed evidence available to him.

A careful review of the transcript leads this Court to conclude that it does not have sufficient information at this time to determine "with a high level of confidence," *see Heath*, 455 F.3d at 60, whether both contingencies would have been satisfied had Marx not discovered the narcotics and had McAuley not admitted that he would test positive for "everything."

Prior to the search, Marx had been informed by the Brutons that they observed McAuley hide suspected drugs in his pocket.  Although Marx was entitled to rely on the information provided by the Brutons because they were "identified bystander[s] with no apparent motive to falsify" their observations, *see Caldarola v. Calabrese*, 298 F.3d 156, 163 (2d Cir. 2002) (quoting *United States v. Rollins*, 522 F.2d 160, 164 (2d Cir. 1975), *cert. denied*, 424 U.S. 918 (1976)), Marx took no steps to evaluate the reliability of their observations – such as, to inquire about the details of their observations, the conditions under which they made the observations and the basis for their belief that the object was narcotics.  Without additional

information, the conclusory suspicion that the Brutons revealed to Marx does not contribute significantly to the probable cause analysis.

      In addition to the Brutons' observations, Marx's own observations of McAuley caused him to suspect that McAuley was under the influence of a metabolite.  Specifically, Marx testified that McAuley was slurring his speech, had dilated pupils and was nervous and fidgety. Marx, a certified drug recognition expert, testified that these characteristics are consistent with an individual under the influence of narcotics.  The record is unclear, however, whether disregarding the discovery of the drugs and McAuley's admission that he would test positive for "everything," a reasonable officer in Marx's position would have concluded that probable cause existed to believe that McAuley was under the influence of a metabolite.  While the probable cause determination is an objective one, Marx's training and experience as a drug recognition expert is relevant to the probable cause analysis.  *See United States v. Steppello*, 664 F.3d 359, 364 (2d Cir. 2011) ("some patterns of behavior which may seem innocuous enough to the untrained eye may not appear so innocent to the trained police officer who has witnessed similar scenarios numerous times before[;] . . . [a]s long as the elements of the pattern are specific and articulable, the powers of observation of an officer with superior training and experience should not be disregarded") (quoting *Delossantos*, 536 F.3d at 159).  Marx's specialized training is particularly relevant where, as here, the criminal charge at issue does not require evidence of actual impairment, but simply ingestion.  *See State v. Hechtle*, 89 P.3d 185, 190 (Utah Ct. App. 2004) (finding no probable cause to arrest for driving under influence of metabolite in part because the officer "made no attempt to involve a certified [drug recognition expert] to validate his suspicions").

51

Similar uncertainty surrounds the issue of whether the government has demonstrated that Marx would have arrested McAuley if the drugs had not been discovered and the statements had not been made. Although Marx testified that if he had not discovered the *methamphetamine*, he either would have arrested McAuley or "investigated further," he was not asked what he would have done had he not discovered the *marijuana*. *See Heath*, 455 F.3d at 58 ("[e]ven if the present record provides enough evidence to suggest that a reasonable police officer could have made a valid arrest supported by probable cause, it does not establish with a sufficiently high degree of certainty that a reasonable police officer would have made the arrest under the circumstances") (emphasis omitted). In order to ascertain the information necessary to properly determine the applicability of the inevitable discovery doctrine to the facts of this case, a hearing shall be conducted on **February 4, 2014**, at **2:30 p.m.**, to further develop the record.

## IV.   November 2003 Pre-Search and Post-Arrest Statements

In addition to the statements discussed above, McAuley also made statements prior to the search and subsequent to his arrest. With respect to the first category of statements – those made prior to the search of McAuley – the government submits that McAuley does not challenge the admission of those statements.[25]  (Docket # 431 at 13).  Having reviewed McAuley's submission, I agree that his challenge appears limited to the post-search statements. (Docket # 426 at 11 ("Therefore, the alleged narcotics and the subsequent statements made by

---

[25] In its submission, the government describes the statements as follows:  "McAuley made certain roadside statements to Lieutenant Marx (to the effect that he was driving down the road and his carburetor caught on fire, and that he had just bought the Suburban and was driving it home to New York)."  (Docket # 431 at 13).

Mr. McAuley, at the roadside and otherwise, should be suppressed")).   Accordingly, the Court concludes that McAuley's pre-search statements should not be suppressed.

With respect to the latter category of statements – those made after the arrest of McAuley – I conclude that the Court does not have sufficient information to clearly identify the statements at issue, much less make a determination regarding the suppression of any such statements.   McAuley seeks suppression of any such statements on the grounds that the statements are the fruit of the unlawful search and seizure.   In opposition, the government addresses only a subset of the statements that were made after McAuley's arrest.   For instance, the government describes the post-arrest statements as those "documented on an accident report and a DUI report."   (Docket # 431 at 18).   Although the DUI report was admitted into evidence, it was received for the limited purpose of "showing the *Miranda* rights that were read to McAuley, as well as his response to the questions and whether he understood them."   (Tr. A 31). The accident report was not received into evidence, nor did the government elicit testimony concerning the statements reflected on the report or the circumstances under which they were made.   Finally, Marx testified that McAuley made additional statements after his arrest, but before he was administered the *Miranda* warnings.   (Tr. A 52).   The government has not addressed the admissibility of these post-arrest, pre-*Miranda* statements.

With respect to McAuley's post-*Miranda* statements, the government contends that the statements should not be suppressed because they were made after McAuley knowingly and voluntarily waived his *Miranda* rights.   (Docket # 431 at 18-19).   In light of the Court's conclusion that Marx unlawfully searched McAuley, the government has the burden of demonstrating both that the statements were not elicited in violation of McAuley's *Miranda*

53

rights and that they were sufficiently purged from the taint of the illegal search.[26]  Neither party has addressed the attenuation issue.

The parties are directed to confer to determine what, if any, specific post-arrest statements made by McAuley the government intends to offer at trial.  The parties shall file supplemental submissions identifying those statements and their positions on attenuation and whether an additional evidentiary hearing is required.  Such submissions shall be filed by no later than **January 31, 2014**.

## V.    Suppression of Evidence from 2005 New York Arrest

McAuley seeks to suppress the tangible evidence seized from the black BMW on August 23, 2005.  (Docket # 426 at 12-13).  McAuley argues that in forming suspicion to stop the vehicle, law enforcement improperly relied upon information supplied by Austin, who was not a reliable informant.  (*Id.*).  According to McAuley, because Austin was not reliable, law enforcement agents were not entitled to rely upon the information he provided, and in the absence of such information, had no lawful basis to stop and subsequently to search the vehicle.[27] (*Id.*).  The government opposes McAuley's motion, maintaining that Austin was reliable and that, in any event, the information he provided was sufficiently corroborated by law enforcement.

---

[26]  To the extent that the Court ultimately concludes that probable cause for McAuley's arrest was lacking, the government will also bear the burden of establishing that the post-arrest statements are sufficiently attenuated from the illegal seizure.  *See United States v. Irving*, 2009 WL 4280287, *6 n.4 (E.D.N.Y. 2009) ("[a]lthough post-arrest statements made by defendant are not necessarily suppressed if the arrest is unsupported by probable cause, it is the government's burden to show that the taint of the unlawful arrest sufficiently dissipated before the statements were made").

[27]  It is not clear from McAuley's submission whether he challenges only the basis of the initial stop of the vehicle or also challenges the subsequent search of the vehicle.  In the interest of completeness, the Court will address both.

54

(Docket # 431 at 19-21, 23-24).  Thus, according to the government both reasonable suspicion and probable cause existed to justify the stop of the vehicle.  (*Id.*).  In addition, the government argues that once the vehicle was stopped, a search of the vehicle was authorized under either the automobile or the search incident to arrest exceptions to the warrant requirement.  (*Id.* at 21-23).

A.    **Stop of the Black BMW**

According to the Second Circuit, an ordinary traffic stop constitutes a limited seizure within the meaning of the Fourth Amendment.  *United States v. Scopo*, 19 F.3d 777, 781 (2d Cir.) (citing *Delaware v. Prouse*, 440 U.S. 648, 653 (1979)), *cert. denied*, 513 U.S. 877 (1994).  A traffic stop "must be justified by probable cause or reasonable suspicion, based on specific and articulable facts, of unlawful conduct."  *Id.* (quoting *United States v. Hassan El*, 5 F.3d 726, 729 (4th Cir. 1993), *cert. denied*, 511 U.S. 1006 (1994)); *see Terry v. Ohio*, 392 U.S. at 30 (police officer may lawfully conduct brief stop if officer "observes unusual conduct which leads him reasonably to conclude in light of his experience that criminal activity may be afoot"); *see also Knowles v. Iowa*, 525 U.S. 113, 117 (1998) (routine traffic stop is more analogous to *Terry* stop than to formal arrest).  Evidence obtained as the result of an unjustified traffic stop "'is subject to the fruit of the poisonous tree doctrine' and may be suppressed."  *United States v. Scopo*, 19 F.3d at 781 (citing *United States v. Hassan El*, 5 F.3d at 729); *see also Wong Sun v. United States*, 371 U.S. at 488.

On a motion to suppress, a defendant bears the initial burden of establishing that a government official acting without a warrant subjected him to a search or seizure.  *See United States v. Arboleda*, 633 F.2d 985, 989 (2d Cir.1980) (citations omitted), *cert. denied*, 450 U.S. 917 (1981); *United States v. Chavis*, 48 F.3d 871, 872 (5th Cir.1995); *United States v. Bayless*,

921 F. Supp. 211, 213 (S.D.N.Y. 1996).  Once the defendant has met this burden, the burden then

shifts to the government to demonstrate by a preponderance of the evidence that the search or

seizure did not violate the Fourth Amendment.  *United States v. Bayless*, 921 F. Supp. at 213

(citing *United States v. Arboleda*, 633 F.2d at 989); *see also United States v. Bonilla Romero*,

836 F.2d 39, 45 (1st Cir. 1987) ("[w]hen it has acted without a warrant, the ultimate burden of

persuasion is then upon the government to show that its evidence is not tainted") (citing

*Alderman v. United States*, 394 U.S. 165, 183 (1969)), *cert. denied*, 488 U.S. 817 (1988).

As the Supreme Court explained in *Terry*, reasonable suspicion to justify an

investigative detention must be based upon "specific and articulable facts which, taken together

with rational inferences from those facts, reasonably warrant [the] intrusion" on a citizen's

Fourth Amendment interests.  *Terry v. Ohio*, 392 U.S. at 21.  Reasonable suspicion is to be

determined by the totality of the circumstances, but need not satisfy either the probable cause or

preponderance of the evidence standard.  *United States v. Arvizu*, 534 U.S. 266, 273-74 (2002).

> Stated another way:
>
> Reasonable suspicion is a less demanding standard than probable
> cause not only in the sense that reasonable suspicion can be
> established with information that is different in quantity or content
> than that required to establish probable cause, but also in the sense
> that reasonable suspicion can arise from information that is less
> reliable than that required to show probable cause. . . .  Reasonable
> suspicion, like probable cause, is dependent upon both the content
> of information possessed by police and its degree of reliability.
> Both factors – quantity and quality – are considered in the totality
> of the circumstances.

*Alabama v. White*, 496 U.S. 325, 330 (1990) (citations omitted).

Reasonable suspicion for a *Terry* stop may be based upon an informant's tip. *Adams v. Williams*, 407 U.S. 143, 147 (1972). In determining whether an informant's tip establishes reasonable suspicion, a court must assess the totality of the circumstances. *United States v. Elmore*, 482 F.3d 172, 179 (2d Cir. 2007) (citing *Illinois v. Gates*, 462 U.S. at 213). A significant factor in that mix is the informant's reliability. *Adams v. Williams*, 407 U.S. at 147. In addition, "the informant's 'basis of knowledge' and 'veracity' (*i.e.*, how he knows and why we should believe him) remain highly relevant to a determination of . . . reasonable suspicion." *United States v. Elmore*, 482 F.3d at 179 (citing *Alabama v. White*, 496 U.S. at 328-29). The Second Circuit has explained that the "basis of knowledge" inquiry examines "the quality of [the informant's] sources of knowledge of the information." *United States v. Wagner*, 989 F.2d 69, 73 (2d Cir. 1993). In other words, the Court must assess whether the informant's allegations are based on reliable sources, "such as first-hand observations or second-hand information from reliable sources, rather than on unreliable means such as rumor or innuendo." *Id.*

Informant information that, standing alone, does not adequately demonstrate the informant's veracity and basis of knowledge may still amount to reasonable suspicion if it is sufficiently corroborated. *Elmore*, 482 F.3d at 179 (citing *Draper v. United States*, 358 U.S. 307 (1959)). As to the balance between reliability and corroboration, the Second Circuit has explained:

> [I]t is useful to think of known reliability and corroboration as a sliding scale. Where the informant is known from past practice to be reliable, as in [*Adams v.*] *Williams*, no corroboration will be required to support reasonable suspicion. Where the informant is

completely anonymous, as in [*Alabama v.*] *White*, a significant
amount of corroboration will be required.

*Id.* at 181.

Considering the totality of the circumstances, I easily conclude that the

information provided by Austin bore sufficient indicia of reliability and, in any event, was

adequately corroborated to support reasonable suspicion justifying the stop of the black BMW.

As an initial matter, although Austin was a paid informant with a criminal history, he was known

to DeSantis, had met with DeSantis in person on multiple occasions, and had previously provided

reliable information that had led to the apprehension of a fugitive.  These factors weigh in favor

of a finding of reliability.  *See id.* at 180-81 ("[a] known informant's reputation may be assessed

and he may be held accountable if his allegations turn out to be fabricated . . . [and] an informant

is more reliable if he meets with the police face-to-face because he runs a greater risk that he will

be held accountable if his information proves false").

Further, the record establishes that the law enforcement agents reasonably

concluded that Austin had an adequate basis of knowledge of Lawless's activities.  Austin

informed DeSantis that he was a longtime friend of Lawless and he provided reports of multiple

meetings with Lawless.  Indeed, Austin provided the FBI with detailed information concerning

the planned shooting at Gorman's, which was consistent with access to first-hand, inside

information concerning Lawless's criminal activities.  *See id.* at 183 (informant's basis of

knowledge was well-established where she informed officer that her information was based upon

personal observations); *United States v. Agapito*, 620 F.2d 324, 332 (2d Cir.) (information

sufficiently reliable where informant had provided reliable information in the past and where the

nature of the information "indicated that it was based upon firsthand observation"), *cert. denied*,

449 U.S. 834 (1980); *United States v. Singleton*, 608 F. Supp. 2d 397, 403 (W.D.N.Y. 2009)

("[t]ypically, and most often in the context of a suppression hearing, an informant's reliability

can be established by testimony by a law enforcement officer regarding previous information

learned from an informant") (internal quotation omitted); *United States v. Vanhoesen*, 552

F. Supp. 2d 335, 339 (N.D.N.Y. 2008) ([i]nformation provided by a named informant is

generally considered more reliable than information provided by an 'anonymous tipster'")

(quoting *United States v. Canfield*, 212 F.3d 713, 719 (2d Cir. 2000)).

    Finally, the record establishes that the law enforcement agents sufficiently

corroborated the information provided by Austin.  First, DeSantis testified that he tested Austin's

veracity by interrogating him about information which DeSantis already knew.  Next, and

significantly, two of the conversations between Austin and Lawless discussing details of the

planned shooting were recorded and reviewed by DeSantis.  Finally, various details that Austin

provided about the plans for the shooting were corroborated prior to the traffic stop.  For

instance, in accordance with the plan previously provided by Austin, law enforcement observed

Austin and McAuley arrive at Lawless' residence on August 23, 2005 and overheard them

discuss the route to Gorman's and how to properly clean the firearms to avoid detection.  Law

enforcement agents subsequently observed McAuley and Lawless leave the residence in the black

BMW and proceed towards Gorman's with Austin following in his own car.  Thus, law

enforcement "observed conduct predicted accurately by the tip . . . , confirming that [Austin] had

insider knowledge about [Lawless] and [his] criminal activity that made [Austin] credible."

*United States v. Vanhoesen*, 552 F. Supp. 2d at 341 (information provided by informant was

corroborated where the defendant "arrived at the pre-described and agreed-upon location, in the car that the informant had described, at the time expected, and his arrival was followed by a call to the informant to inquire as to the informant's whereabouts").  Accordingly, I conclude that the information supplied by Austin, which was corroborated in substantial measure, was sufficient to create reasonable suspicion to justify the stop of the black BMW.  *See Elmore*, 482 F.3d at 183 ("[a] tip from a citizen informant whose identity is disclosed . . . that is corroborated to a significant degree can support a finding of reasonable suspicion"); *United States v. Shamsideen*, 2004 WL 1179304, *4 (S.D.N.Y. 2004) (officer had reasonable suspicion to justify stop of vehicle even if informants were not known to be reliable where information was confirmed by officer's own observations).

### B.    Search of the Black BMW

The government argues that the warrantless search of the black BMW was permissible under two different exceptions to the warrant requirement.  (Docket # 431 at 21-23). First, the government maintains that the search of the vehicle was authorized by the automobile exception because law enforcement had "probable cause to believe that the vehicle contain[ed] contraband."  *United States v. Navas*, 597 F.3d 492, 497 (2d Cir.), *cert. denied*, 131 S. Ct. 320 (2010).  Alternatively, the government contends that the vehicle was properly searched incident to McAuleys's arrest because law enforcement "[reasonably believed] evidence relevant to the crime of [McAuley's] arrest might be found in the vehicle."  *See Arizona v. Gant*, 556 U.S. 332, 343 (2009).

The automobile exception permits law enforcement to "conduct a warrantless search of a readily mobile motor vehicle if probable cause exists to believe the vehicle contains

contraband or other evidence of a crime." *United States v. Howard*, 489 F.3d 484, 492 (2d Cir.)

(quoting *United States v. Gaskin*, 364 F.3d 438, 456 (2d Cir. 2004), *cert. denied*, 544 U.S. 990

(2005)), *cert. denied*, 552 U.S. 1005 (2007).  If an officer has probable cause to believe that a

vehicle contains contraband or evidence, the permissible scope of the search extends anywhere

within the vehicle that the contraband or evidence may be located, including containers or

packages.  *United States v. Gagnon*, 373 F.3d 230, 235 (2d Cir. 2004).

   "Probable cause exists if a law enforcement official, on the basis of the totality of

the circumstances, has sufficient knowledge or reasonably trustworthy information to justify a

person of reasonable caution in believing that an offense has been or is being committed." *Id.* at

236.  Thus, "[p]robable cause does not require 'a prima facie showing of criminal activity' nor a

'demonstrat[ion] that it is more probable than not that a crime has been or is being committed."

*United States v. Wilson*, 94 F. App'x 14, 16 (2d Cir. 2004) (alterations in original) (quoting

*United States v. Ginsberg*, 758 F.2d 823, 828 (2d Cir. 1985)).  Ultimately, whether probable

cause exists, "depends on the totality of the circumstances, . . . including the information

possessed by the officer prior to making the arrest and [his] experience." *Id.* (citations omitted).

Probable cause to search a vehicle under the automobile exception may be based upon

information supplied by an informant provided the informant is reliable under the totality of the

circumstances.  *See United State v. Gagnon*, 373 F.3d at 236-37.

   In this case, law enforcement officials had ample information to believe that

firearms would be found in the black BMW, and I easily conclude that probable cause existed to

justify a search of the vehicle for firearms.  As discussed above, the information provided by

Austin bore sufficient indicia of reliability and was sufficiently corroborated to justify law

enforcement's reliance on the information.  The information was that McAuley and Lawless, the

occupants of the black BMW, were en route to Gorman's to shoot members of a rival motorcycle

club.  In addition, Austin, who had met with McAuley and Lawless immediately before they got

into the vehicle, informed DeSantis that they had brought their firearms with them in the vehicle.

DeSantis conveyed that information to the law enforcement agents present at the DWI

checkpoint.  Although DeSantis did not personally observe McAuley and Lawless with the

weapons, he was justified in relying on Austin's report that the vehicle contained weapons.  *See*

*United States v. Wagner*, 989 F.2d at 73 ("if an informant's declaration is corroborated in

material respects, the entire account may be credited, including parts without corroboration").

Under such circumstances, a warrantless search of the vehicle was justified by probable cause to

believe that the car contained firearms.  Accordingly, I recommend that the district court deny

McAuley's motion to suppress the tangible evidence seized from the black BMW.[28]


## VI.   Suppression of Recordings of Jail Telephone Calls

McAuley seeks suppression of recordings of telephone calls he made while he was

incarcerated on the grounds that the calls were intercepted without a warrant in violation of Title

III, 18 U.S.C. §§ 2510-22.  (Docket # 234-9 at 9-10).  On August 8, 2012, during oral argument,

the government was granted permission to submit an affidavit in opposition to the motion.

McAuley was instructed to inform the Court thereafter whether McAuley intended to press his

motion.  On August 31, 2012, the government submitted the affidavit of FBI Special Agent

---

[28] Having concluded that the search of the vehicle was justified under the automobile exception, I need not reach the issue whether the search was also justified as a search incident to the lawful arrest of McAuley.

Michael J. Preisser ("Preisser").  (Docket # 269-1).  McAuley apparently has not indicated

whether he is persisting in his motion, and thus this Court will provide a recommendation on the

motion.

A.     **Preisser's Affidavit**

In his affidavit, Preisser provided information regarding the inmate telephone

policies and procedures at two different facilities – the Onondaga County Justice Center ("Justice

Center") and the Onondaga Correctional Facility, which is located in Jamesville, New York

("Jamesville Facility").[29]  (Docket # 269-1 at ¶ 2).  According to Preisser, McAuley was

incarcerated at the Justice Center between April 20, 2007 through October 2, 2007 and was

incarcerated at the Jamesville Facility between October 2, 2007 and April 29, 2008.  (*Id.* at ¶ 3).

According to Preisser, outgoing telephone calls made by inmates at the Justice

Center are automatically recorded by a computer system as a matter of standard operating

procedure unless the call is made to an attorney or to a member of the clergy.  (*Id.* at ¶ 4).  When

an inmate initiates an outgoing phone call, an automatic message plays prior to the call.  (*Id.*).

According to Preisser, the message is audible to both parties to the call and announces, in

pertinent part, "You have a collect call from [McAuley], an inmate at Onondaga County Jail.

This call is from a correctional institution and is subject to monitoring and recording."  (*Id.* at

¶¶ 4-5).

---

[29]  The papers submitted by the parties do not clearly identify which facilities are at issue.  McAuley's
motion seeks suppression of telephone calls intercepted from the "Onondaga County Jail" and "FCI Elkton."
(Docket # 234-1 at ¶ 27).  The government's opposition addresses telephone calls intercepted from the Justice Center
and the Jamesville Facility.  (Docket # 269-1 at ¶ 3).  This report and recommendation addresses the suppression of
recordings of telephone calls intercepted from the Justice Center and the Jamesville Facility.

According to Preisser's affidavit, McAuley initiated approximately 577 outgoing telephone calls while he was incarcerated at the Justice Center.  (*Id.*).  McAuley admitted in two of the calls that he was aware that the calls were being monitored.  (*Id.*).  Specifically, during a May 17, 2007 telephone call, McAuley stated, "This is being recorded anyways."  (*Id.*).  During a May 27, 2007 telephone call, the defendant stated, "[The Feds] only let me and Donna [Boon] talk when they think we're gonna give up our defensive plan . . . .  Yeah, they monitor everything."  (*Id.*).

According to Pressier, a similar automated message played at the beginning of inmate calls made from the Jamesville Facility, which informed both parties to the call that the calls "may be monitored and/or recorded."  (*Id.* at ¶ 7).  In addition, Preisser affirmed that a sign by each individual telephone at the Jamesville Facility indicated that the facility reserved the right to monitor and record telephone calls.  (*Id.*).  According to Preisser, McAuley made approximately 215 telephone calls while he was incarcerated at the Jamesville Facility.  (*Id.*).  Preisser also stated that McAuley used "code names and terms to discuss . . . associates . . . , places and activities" during his telephone calls at both facilities.  (*Id.* at ¶ 8).

According to Preisser, on approximately October 2, 2007, McAuley was issued a copy of the Jamesville Facility's inmate handbook and confirmed his receipt of the handbook by signing for it.  (*Id.* at 5, ¶ 5).  Section 31(A) of the handbook stated that "[a]ll calls except attorney calls are monitored and recorded."  (*Id.* at 5, ¶ 5 and Attachment A).  In addition, Section 31(D) of the handbook informed inmates that personal calls "will be monitored and recorded."  (*Id.*).  Finally, according to Preisser, on October 2, 2007, McAuley executed a form entitled, "The Onondaga County Department of Correction Inmate Telephone System

64

Acknowledgement [sic]." (*Id.* at ¶ 6 and Attachment B). The form acknowledged that the

"Onondaga County Department of Correction collect call telephone system monitors all inmate

telephone activity, with the exception of telephone calls placed to your attorney." (*Id.*).

McAuley's signature appears below the statement, "I acknowledge receipt of this information

and understand that all collect telephone call conversations will be monitored except for attorney

calls." (*Id.*).

      B.    **McAuley's Affidavit**

      In support of his suppression motion, McAuley submitted an affidavit stating that

there was no sign at the Onondaga County Jail informing inmates that the phone calls would be

recorded. (Docket # 234-8 at ¶ 10). In addition, McAuley stated that he did not consent to the

recording of any of the phone calls he made while incarcerated at the Onondaga County Jail.

(*Id.*).

      C.    **Title III Analysis**

      In general, in the absence of judicial authorization, Title III prohibits the

intentional interception of telephone calls and admission at trial of any recordings of unlawfully

intercepted telephone calls. *United States v. Friedman*, 300 F.3d 111, 120 (2d Cir. 2002) (citing

18 U.S.C. §§ 2510-2522), *cert. denied*, 538 U.S. 981 (2003). Although inmates are "entitled to

the protections afforded by Title III[,] . . . no violation of Title III occurs where the inmate has

consented to the interception." *United States v. Anderson*, 2012 WL 3648189, *4 (W.D.N.Y.)

(citing *United States v. Workman*, 80 F.3d 688, 692 (2d Cir.), *cert. denied*, 519 U.S. 938 (1996)),

*report and recommendation adopted*, 2012 WL 3648142 (W.D.N.Y. 2012). Such consent may

be express or implied through evidence that an inmate was notified that telephone calls were

subject to monitoring or recording.  *See United States v. Workman*, 80 F.3d at 693 ("inmates

impliedly consent to have their telephone conversations monitored where they have received

notice of the surveillance and nevertheless use the prison telephones"); *United States v.*

*Willoughby*, 860 F.2d 15, 19-20 (2d Cir. 1988) ("[i]n the prison setting, when the institution has

advised inmates that their telephone calls will be monitored and has prominently posted a

notice[,] . . . the inmates' use of those telephones constitutes implied consent to the monitoring

within the meaning of Title III"), *cert. denied*, 488 U.S. 1033 (1989); *United States v. Anderson*,

2012 WL 3648189 at *4 (automated messages and posted signs warning that telephone calls

were subject to being recorded or monitored was "sufficient to support a finding that the inmate

impliedly consented to having his calls recorded").

        The government has offered Preisser's affidavit to establish that McAuley was

provided notice at both facilities that his telephone calls were subject to being monitored and

recorded.  According to Preisser, at the Justice Center, McAuley was provided notice of the

telephone policy through an automated message that played prior to each telephone call.  Indeed,

his knowledge of the policy is reflected in his own admissions during two of the recorded

telephone calls.  As to this facility, McAuley simply contends that there was no sign informing

him of the policy posted next to the telephones.  With respect to the Jamesville Facility, Preisser

states that McAuley was provided notice of the facility's telephone monitoring policy in various

forms, including through an automated message, a sign posted next to the telephone system, the

facility handbook and an acknowledgment form provided to him when he arrived at the facility.

        In sum, I find that McAuley received clear notice at both the Justice Center and

the Jamesville Facility that his telephone calls would be monitored or recorded; his decision to

initiate telephone calls despite that notice establishes his implied consent to the recording and monitoring of his telephone calls.  Accordingly, I recommend denial of McAuley's motion to suppress the telephone calls.


## CONCLUSION

For the reasons stated above, I recommend that the district court deny McAuley's motions to dismiss, his motion to suppress tangible evidence seized on August 23, 2005, and his motion to suppress recordings of jailhouse telephone calls.  (Docket # 234).  Further, for the reasons stated above, I recommend that the district court grant McAuley's motion to suppress the three statements he made during the unlawful search of his person on November 19, 2003 as identified herein.  The hearing shall be continued on **February 4, 2014**, at **2:30 p.m.**, for the purpose of further developing the record on McAuley's motion to suppress the methamphetamine seized on November 19, 2003.  The parties are directed to file supplemental submissions regarding post-arrest statements made on November 19, 2003, in accordance with the Court's directions herein, by no later than **January 31, 2014**.


_s/Marian W. Payson_
MARIAN W. PAYSON
United States Magistrate Judge

Dated:  Rochester, New York
          January __17__, 2014


67

Pursuant to 28 U.S.C. § 636(b)(1), it is hereby

**ORDERED**, that this Report and Recommendation be filed with the Clerk of the Court.

**ANY OBJECTIONS** to this Report and Recommendation must be filed with the Clerk of this Court within fourteen (14) days after receipt of a copy of this Report and Recommendation in accordance with the above statute and Rule 59(b) of the Local Rules of Criminal Procedure for the Western District of New York.[30]

The district court will ordinarily refuse to consider on *de novo* review arguments, case law and/or evidentiary material which could have been, but was not, presented to the magistrate judge in the first instance.  *See, e.g.*, *Paterson-Leitch Co. v. Mass. Mun. Wholesale Elec. Co.*, 840 F.2d 985 (1st Cir. 1988).

**Failure to file objections within the specified time or to request an extension of such time waives the right to appeal the District Court's Order.**  *Thomas v. Arn*, 474 U.S. 140 (1985); *Small v. Sec'y of Health & Human Servs.*, 892 F.2d 15 (2d Cir. 1989); *Wesolek v. Canadair Ltd.,* 838 F.2d 55 (2d Cir. 1988).

The parties are reminded that, pursuant to Rule 59(b) of the Local Rules of Criminal Procedure for the Western District of New York, "[w]ritten objections . . . shall specifically identify the portions of the proposed findings and recommendations to which objection is made and the basis for such objection and shall be supported by legal authority."  **Failure to comply with the provisions of Rule 59(b) may result in the District Court's refusal to consider the objection.**

Let the Clerk send a copy of this Order and a copy of the Report and Recommendation to the attorneys for the parties.

**IT IS SO ORDERED.**

                                        s/Marian W. Payson
                                        _____
                                        MARIAN W. PAYSON
                                        United States Magistrate Judge

Dated: Rochester, New York
       January   17   , 2014

---

[30]  Counsel is advised that a new period of excludable time pursuant to 18 U.S.C. § 3161(h)(1)(D) commences with the filing of this Report and Recommendation.  Such period of excludable delay lasts only until objections to this Report and Recommendation are filed or until the fourteen days allowed for filing objections has elapsed.  *United States v. Andress*, 943 F.2d 622 (6th Cir. 1991); *United States v. Long*, 900 F.2d 1270 (8th Cir. 1990).